59948

R10

In the Matter of the Arbitration between

---x

**TRANSPORT WORKERS UNION OF GREATER NEW YORK, LOCAL 100**

**DAN #**
24-2303-0035

**-and-**

**OPINION AND AWARD**

**METROPOLITAN TRANSIT AUTHORITY**

(Tramell Thompson, Pass # 887164)

RAPID TRANSIT OPERATIONS DIVISION

---x

Before, **Stephen F. O'Beirne,** Impartial Arbitrator

**APPEARANCES**

RECEIVED
AUG 20 2024
LOCAL 100
GRIEVANCE OFFICE

**For the Union**
Edward Kennedy, Esq., Union Attorney
Kenneth Rivera, Union Representative
Jonluke Rodriguez, Union Representative
Tramell Thompson, Grievant

**For the Employer**
Jerry Granata, Esq., MTA Attorney
Vickram Soenda, Train Service Supervisor
Dawn Stewart, Special Investigations & Review Director

**OPINION**

On July 1, 2024 the parties agreed to submit the following issues to arbitration by me:

Whether the Employer has cause to discharge Grievant Tramell Thompson and, if not, what shall be the remedy?

Pursuant to my authority under the parties' collective bargaining agreement ("CBA"), I held a hearing in this matter on Monday, July 1 and Thursday, July 18, 2024 at 2 Broadway in New York City. Both parties appeared by counsel and had full opportunity to adduce evidence, cross-examine each other's witnesses, and make

argument in support of their respective positions. The Union made a closing statement. The Employer submitted a post-hearing brief.[1] Neither party objected to the fairness of this proceeding.

Based on the record so produced, I hereby make the following findings of fact: Grievant Tramell Thompson works as a Conductor for MTA, New York City Transit ("Transit" or the "Employer"). He has worked for Transit for approximately ten (10) years. He has a good number of prior disciplinary infractions in his personnel file.

In this proceeding, the Employer seeks to discharge Grievant based on allegations of misconduct set forth Disciplinary Action Notification No. 24-2303-0035, as follows:

***Specifications:***

*The Division of Special Investigations and Review (SIR) investigated a series of complaints against [Grievant] and issued a report dated February 5, 2024, which determined that there was reasonable cause to believe that [Grievant] engaged in conduct which violated the Authority Rules and Regulations as follows:*

***(A) May 10, 2021 – Incident with TSS Vickram Soenda.***

*[Grievant] posted on Facebook a photo and details about a Train Service Supervisor (TSS) and promise[d] to give [him] a reality check..., which the TSS and the supervisory union reported as a threat. [Grievant] acknowledged that [he] posted the photo and statement but denied that it was a threat. As a result of [Grievant's] post, the TSS's work schedule was posted by another Facebook user and another responded "CRUCIFY HIM" which caused the TSS to become alarmed.*

*[Grievant] posted an internal NYC Transit email from a then Senior Director to the Train Service Supervisor which was not addressed to [Grievant]. SIR found this to be gross misconduct.*

[1] The Employer cites the following prior arbitration awards in its brief: DAN # 20-2358-0026 (E. Cacavas, December 28, 2020); DAN # 19-5252-0206 (P. Maier, October 2, 2019); and DAN # 20-2733-0186 (E. Pfeffer, December 9, 2020).

***(B) December 21, 2021 – Posting of Lewd Video.***

*[Grievant] posted a video of a woman who appeared to be asleep on the train as a male masturbated in front of her and ultimately ejaculated on the sleeping woman. The Social Media Review Committee determined that the posting of the video violated the social [media] and Respectful Workplace Policies.*

**(C) January 26, 2022 - Dissemination of False Information.**

*SIR found that [Grievant] disseminated false information in a video in which [he] appeared alleging wrong doing by Assistant Chief Officer of Transportation. [Grievant] admitted to SIR that [he has] no proof for these claims and the information is not verified, but sometimes [he has] to put things out there to be investigated. [Grievant's] dissemination of false information, without a clear caveat that the claims were made without [evidence] and based on speculation, constitutes misconduct. The unsupported and unproved claims shared on [Grievant's] social media page gave the appearance of an impropriety by an ACTO, that was known by NYCT, and therefore negatively reflected on the Agency.*

*Based on the foregoing, [Grievant is] charged with gross misconduct and conduct unbecoming of an Authority employee. [His] actions as described above constitute serious misconduct detrimental to the operation and are such that would tend to create adverse criticism of the Authority.*

The Union denies the charges on Grievant's behalf.

<u>Relevant Rules, Regulations and Policy Directives</u>

<u>Transit Rules and Regulations</u>

*Rule 10(a) Employees are required to avoid behavior which would tend to create adverse criticism of the Authority and/or of the System. Their conduct, whether on or off duty on System property, is required to be such as to merit the confidence and respect of the public and their superiors.*

<u>MTA Code of Ethics</u>

*Section 4.03 Confidential Information*

*Employees shall not disclose Confidential Information without the permission of the MTA General Counsel or their designee for any purpose or use such information to further their personal interests.*

<u>MTA All Agency Policy Directive – Respectful Workplace</u>

*III. POLICY*

*It is the policy of the MTA to maintain a professional work environment where all individuals are treated, and treat each other, with respect. Disrespectful conduct, harassment and bullying of coworkers, customers vendors, contractors or suppliers by MTA employees is prohibited and is against MTA core values.*

*IV. SPECIFIC DIRECTIVES*

A. *Determining What is Disrespectful Conduct*

*Disrespectful conduct can include derogatory comments or jokes based on any class of people, including race, sex, color, religion, sexual orientation, disability, national origin, ethnicity or any other category prohibited by MTA policy; use of degrading words or graphics to describe or refer to an individual or group, and cursing and name calling. Disrespectful conduct can, but does not always* include, racist or sexist language, slurs, or images, or phrases that incite discrimination or make threats of violence. Posting material online, including on social media platforms, even when made outside of work, can be hurtful to other people, including coworkers or customers, and may constitute violation of this Policy, where they negatively affect the workplace or the MTA's ability to serve the public.

C. *Addressing Disrespectful Conduct*

*Employees who engage in disrespectful conduct at work are subject to discipline, up to and including termination.*

*Employees may also be disciplined, up to and including termination, for disrespectful conduct outside of work if the conduct negatively affects the workplace or the MTA's ability to serve the public.*

*Posting pictures of or commentary regarding co-workers may interfere with those co-workers; right to serve the public. The posting of such material may subject that employee to discipline, up to and including termination, when it negatively affects the workplace or the MTA's ability to serve the public.*

D. *No Retaliation*

*MTA prohibits any form of retaliation against an employee who has made a good faith report of a potential violation of this Policy or for cooperating in an investigation. Any employee who engages in such retaliation against a co-worker will be subject to disciplinary action up to and including termination.*

MTA All Agency Policy Directive – Social Media

*B. Social Media Activities that Violate MTA Policies*

*Employees may not use Social Media sites to display or distribute information, including text, photographs or videos, relating to nonpublic MTA activities. Even when an employee uses their own personal computer or account outside of work hours, their use of social media to threaten, harass, bully, or discriminate against co-workers, customers contractors, vendors, or suppliers, or to make any threat of violence can violate MTA policies when the Social Media activity negatively affects the workplace or the MTA's ability to serve the public.*

*C. Confidentiality of Information on Social Media.*

*In accordance with Section 4.03 of the Code of Ethics, employees must maintain the confidentiality of MTA Confidential Information, as defined in the ethics code and may not post or publish such information on Social Media. Such information includes, but is not limited to, the following categories of information: MTA intellectual property assets, security-sensitive infrastructure and operations information, and security procedures, including, without limitation, designs, plans, blueprints, drawings, security infrastructure and protocols, mobilization plan and non-public procurement, human resources or labor relations information.*

New York City Transit Authority Policy Instruction – Respectful Workplace

*1.0 POLICY*

*It is the policy of MTA, New York City Transit, including the Manhattan and Bronx Surface Transit Operating Authority (MaBSTOA) and the Staten Island Rapid Transit Operating Authority (SIRTOA), (hereinafter collectively referred to as MTA, NYC Transit), to maintain a work environment in which all individuals are treated, and treat each other, with respect and dignity. Every employee should be able to work in a professional atmosphere free from prohibited discrimination, harassment, acts of intolerance and other offensive and disrespectful behaviors.*

*2.0 PURPOSE*

*The purposes of this Policy/Instruction are:*

*To emphasize MTA NYC Transit's commitment to maintaining a professional work environment free from all forms of disrespectful conduct.*

*To make clear that MTA, NYC Transit does not tolerate discrimination, harassment and disrespectful behavior. Employees who engage in discrimination, harassment, acts of intolerance and other offensive and disrespectful behaviors may be subjected to disciplinary action - up to and including termination.*

Based on my review of the record evidence, including my assessment of witness credibility and the probative value of evidence, I find the Employer has shown cause to discipline Grievant. I reach that conclusion for the following reasons:

I must first address two preliminary matters. I deny the Union's motion to dismiss these charges as untimely under Article II, Section 2.1.C.6 of the CBA.[2] The Union contends the charges are untimely because they were not served on Grievant within thirty (30) days of Grievant's immediate supervisor or responsibility center manager having notice of the charges. Section 2.1.C.6 specifically tolls the thirty (30) day limitations period if the alleged misconduct is the subject of an investigation. The limitations period is also tolled by employee absences.[3] These charges were the subject of an investigation by Transit's division of Special Investigations and Review (SIR). There is no time limit on the amount of time such investigations can take. I credit the testimony of SIR Director Dawn Stewart that these allegations were among several complaints involving Grievant (some filed by Grievant himself) SIR was investigating simultaneously. She testified SIR handles approximately five hundred (500) complaints every year and has to prioritize those it deems more serious, such as workplace violence and fraud. There is no time limit for SIR investigations in the CBA and I find Stewart's

---

[2] That portion of the CBA provides: *In the Authority, no disciplinary proceeding shall be commenced more than thirty (30) days after the employee's Responsibility Center Manager or Immediate Supervisor has knowledge of the alleged incompetency or misconduct complained of and described in the charges, provided, however, that such limitation shall not apply when the incompetency or misconduct and described in the charges is the subject of an investigation or would, if proven in a Court of appropriate jurisdiction, constitute a crime. Employee absences and Authority observed holidays shall be excluded from the thirty (30) working days.*

[3] The record shows Grievant was out on Workers' Compensation and/or injury on duty for extensive periods before, during and after this investigation was conducted.

explanation for the delay in issuing a final report to be credible and persuasive. The Union has not shown any prejudice to Grievant due to the delay.

Second, the Union asks I take a negative inference based on Transit's failure to respond to thc Union's information request for a copy of the profane video Grievant allegedly posted on his twitter account. I need not consider the Union's request because I find Transit has not carried its burden of proof in connection with this portion of the charge (Specification B). Transit Counsel's contends Transit does not have (and may never had) physical possession/control of the video and the twitter post was subsequently deleted, leaving only a hyper-link to the deleted post. I accept that explanation. I did not have the opportunity to view the video. More importantly, as far as the record of this arbitration shows, neither did the Union. Transit's only witness at arbitration - SIR Director Dawn Stewart - testified she never viewed the video. As Stewart explained at arbitration, SIR forwarded this portion of the allegations to Transit's Social Media Review Committee (SMRC) for determination. According to the SIR report, the SMRC found the video Grievant allegedly posted, but not the commentary connected thereto, violative of Transit's Social Media and Respectful Workplace policy directives and constituted gross misconduct. There is no report from the SMRC in evidence and no one from that committee appeared to testify at arbitration. I have no idea what the committee based their determinations on. And the Union did not have the opportunity to cross-examine any of the committee members who made those determinations. Based on the graphic description of the video provided by counsel, it may be self-evident why the video violates the policy. But without seeing the video or hearing what the committee

based their conclusions on, I cannot fairly find Grievant culpable of this portion of the charge.

I find Transit has carried its burden to show Grievant culpable of Specification C of the DAN. This Specification alleges Grievant disseminated false information about an Assistant Chief Officer of Transportation (ACTO). Specifically, Grievant broadcast a report on his social media platform alleging, amongst other things, the ACTO gave promotions to a subordinate because the subordinate lent him money. SIR concluded these allegations were unsubstantiated and had previously been the subject of an investigation conducted by the MTA Office of the Inspector General (OIG) in 2018. The OIG investigation did not find any evidence to substantiate the allegation. In his interview with SIR, Grievant admitted he had no evidence to support the allegation, explaining that sometimes he had to "put stuff out there" to be investigated. SIR concluded Grievant was culpable of disseminating false information without a clear caveat his claims were made without evidence and based on speculation. I agree with that conclusion.

At arbitration, Grievant placed great reliance on his use of the word "allegedly" when he broadcast the allegation against the ACTO. I find that reliance misplaced. While it is clear he did use the word allegedly in the video, a review of the video shows he followed that with a sarcastic laugh (heh heh) and warns the supervisor(s) "don't think I don't know what happened." A review of the video is necessary to fully appreciate how Grievant was disingenuously using the term allegedly as a cover for spreading false/ unfounded information. The allegations Grievant made on the video and during his interview with SIR investigators are extremely serious. They impact lives and careers.

They spur costly and time-consuming investigations. They undermine the supervisor's ability to perform his duties and negatively impact the workplace. The Union attempts to distinguish between SIR's finding that the allegations Grievant made were unsubstantiated as opposed to proving them to be false. I'm not sure I fully understand that argument and I don't know how SIR can be expected to prove the allegations false, as opposed to unsubstantiated. I do know that, to date, Grievant has not produced a scintilla of evidence to support the allegations. This was rumor mongering at its worst. Specification C is sustained.

I also find Transit has carried its burden to prove the charges set forth in Specification B of the DAN. There is no question Grievant posted a picture of Train Service Supervisor Vickram Soenda on Facebook and asked members whether he should give him a "reality check" or leave him alone. Members of the Facebook group responded with a number of comments, one revealing Soenda's work location, another suggesting he be crucified and another referred to him as "straight scum." When one member posted he had heard a rumor that a Train Operator or Conductor had thrown Soenda's work tools out of a train cab and onto the roadbed, Grievant appears to verify the rumor, saying the Train Operator or Conductor was fired for another incident and felt they were being targeted. Grievant told SIR Investigators and testified at arbitration he did not intend to threaten Soenda with bodily harm but was merely seeking input from members of the Facebook group whether he should feature him on his YouTube show. SIR ultimately concluded Grievant's post was not an overt threat of physical violence.

I am willing to accept SIR's conclusion that Grievant's post was not an overt threat of physical violence. But the inquiry does not end there. Soenda clearly believed

this may have been a veiled threat of physical violence. He filed a police report, contacted Labor Relations and filed a complaint with OIG. Prior to being altered to Grievant's Facebook post, Soenda had never met Grievant and had no idea who he was. Based on his testimonial demeanor, I find he was genuinely concerned with his own safety as well as that of his family. He referenced several incidents where supervisors were the victims of violence, either to their person or their property. Whether those incidents actually happened is irrelevant. There are no shortages of actual incidents of workplace violence at Transit and at workplaces in general, many of those involving death or serious injury. While Grievant may not have intentionally intended to threaten Soenda with violence, Soenda thought that was a distinct possibility. So did his union representatives. I find their interpretation of Grievant's post to be reasonable, regardless of what Grievant's intent was.

In my opinion, Grievant's post was undoubtedly intended to harass, intimidate and bully Soenda. There is simply no other rationale explanation for it. Any doubts I might have harbored about that were dispelled by Grievant's posting of the private email message Grievant sent to a Senior Transit Labor Relations Director complaining about the post and seeking advice and assistance. Grievant contends he received the email from a fake Twitter account that has since been deleted. Regardless of how he obtained the email, Grievant had no right to read it, much less post it on social media. In my view, this is outrageous misconduct in violation of all of the MTA/NYCT policy directives listed above. I can discern no legitimate reason to excuse Grievant's misconduct in this regard. Again, I find the only rational explanation to be Grievant intended to harass, intimidate and/or bully Soenda. Grievant's message is clear - he has eyes and ears

everywhere and even if you complain to Labor Relations/ Human Resources in a confidential email he will find out about it and subject you to ridicule on social media. This type of behavior interferes with Transit ability to run its business and is unacceptable in any workplace.

Transit has shown by a clear preponderance of the evidence Grievant violated the MTA Code of Ethics, the MTA All Agency Policy on Social Media, the MTA and NYC Transit Respectful Workplace Policies and Rule 10(a) of Transit's Rules and Regulations. His conduct constitutes gross misconduct, conduct unbecoming a Transit employee and conduct detrimental to efficient operations and services of Transit. These charges alone would likely be enough to sustain the proposed penalty of discharge, regardless of the employee's disciplinary history. Grievant has a very bad disciplinary history. There is no cause for mitigation of the proposed penalty.

Based on all of the foregoing, I issue the following

**AWARD**

The Union's grievance is denied. The Employer does have cause to discharge Grievant Tramell Thompson.

Stephen F. O'Beirne

Dated: August 19, 2024
New York, NY

**AFFIRMATION**

Pursuant to CPLR 7507, I hereby certify I am the impartial arbitrator designated by the parties to hear and decide the above matter and I executed the foregoing as and for my Opinion and Award.

Stephen F. O'Beirne

**Dhondup Gyaltsen**

| | |
|---|---|
| **From:** | Dhondup Gyaltsen |
| **Sent:** | Tuesday, August 20, 2024 5:52 PM |
| **To:** | Arthur Schwartz <aschwartz@advocatesny.com>; Arthur Schwartz AFJLAW (Aschwartz@afjlaw.com); Calendars G and D; Carol Hamilton; Damian Treffs; Deirdre Feerick; Edward Kennedy; Eric Loegel; Jack Blazejewicz; John Chiarello; John Patafio; Mary Ann Conlon; Richard Davis; Rosario Parlanti |
| **Cc:** | Aaron Morrison; Canella Gomez; Jesse Argueta; Jonluke Rodriguez; Kenneth Rivera |
| **Subject:** | Discipline Award |
| **Attachments:** | TWU-0059948 AWARD.pdf |

**Good day all,**

**Attached, Please find the Discipline Award for the following member;**

- **T.THOMPSON** **PASS# 887164** **TWU# 59948** **DAN# 24-2303-0035** **DEPT: RTO**

Thank you and have a Great Day. Don

Dhondup Gyaltsen
**Grievance & Discipline Dept | Transport Workers Union, Local 100**
195 Montague Street, 3rd Floor Brooklyn NY 11201
Office: 212.873.6000 x2014 Fax 347.916.0563
Calendars@twulocal100.org | www.twulocal100.org
"TWU Local 100 - We Move New York" **Save Trees...**

IF A PROBLEM CAN BE SOLVED, NO NEED TO WORRY ABOUT IT.

IF A PROBLEM CANNOT BE SOLVED, WHAT'S THE USE OF WORRYING.

This email was scanned by Bitdefender