**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| TRAMELL THOMPSON,<br><br>Plaintiff,<br><br>-against-<br><br>NEW YORK CITY TRANSIT AUTHORITY; TRANSPORT WORKERS UNION OF GREATER NEW YORK, LOCAL 100; RICHARD DAVIS, individually and in his official capacity as former President of TWU Local 100; JOHN V. CHIARELLO, individually and in his official capacity as President of TWU Local 100; CANELLA GOMEZ, individually and in his official capacity as NYCTA employee and former Vice President of TWU Local 100; BRIAN DAVIS, individually and in his official capacity as officer of TWU Local 100; PAUL MCPHEE, individually and in his official capacity as Chief Officer of Subways; CHRIS BASILE, individually and in his official capacity as General Superintendent; DONALD YATES, individually and in his official capacity as Vice President of TWU Local 100; GARY ROSARIO, individually and in his official capacity as Vice President of TWU Local 100; SCOTT STEINBERG, individually and in his official capacity as TWU Local 100 Division Chairman; DANIEL ASCONA, individually and in his official capacity as TWU Local 100 Division Chairman; JESSE ARGUETA, individually and in his official capacity as TWU Local 100 Executive Board Member; CARLOS BERNABEL, individually and in his official capacity as TWU Local 100 Secretary-Treasurer; JOHN and JANE DOES 1 through 10, individually and in their official capacities,<br><br>Defendants. | **Case No. 1:26-cv-03393-DG-VMS**<br><br>**SECOND AMENDED VERIFIED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## PRELIMINARY STATEMENT

1. This action arises under the civil rights laws of the United States, including 42 U.S.C. § 1983 and Title I of the Labor Management Reporting and Disclosure Act, and under the laws of the State of New York. Plaintiff Tramell Thompson ("Plaintiff"), a Black transit

worker, journalist, elected union officer, union dissident, and whistleblower, brings this action for damages, declaratory, and injunctive relief after his ten-year career as a New York City Transit Authority ("NYCTA") Conductor was destroyed. His elected union office was then stripped from him in retaliation for exercising his constitutionally protected right to speak publicly, on his own time and platforms, about matters of profound public concern, including but not limited to corruption, nepotism, workplace violence, sexual assault, unsafe buses placed into revenue service, racially disparate discipline, and managerial dishonesty within the largest public transit system in North America. Acting in coordination across the management of the employer and the leadership of the union, Defendants executed a scheme to silence, retaliate against, and economically harm Plaintiff through intimidation and retaliation against a victim, witness, and informant, including the use of physical force, threats, intimidation, and interference with Plaintiff's lawful employment and livelihood. Defendants acted for the unlawful purpose of hindering Plaintiff's communications with public and federal authorities, punishing the communications he had already made, removing Plaintiff from his employment and his elected office, and suppressing his speech. As a direct and proximate result of this conduct, Plaintiff suffered concrete injury, including the loss of employment, wages, benefits, the compensation and emoluments of his elected union office, and future economic opportunities, together with physical injury, and seeks compensatory and punitive damages, attorneys' fees, costs, and appropriate equitable relief to prevent and restrain Defendants' ongoing unlawful conduct.

2. Plaintiff brings this action under 42 U.S.C. § 1983 to vindicate his rights under the First and Fourteenth Amendments to the United States Constitution, including claims against

the private union Defendants as willful participants in joint action with the State under *Lugar v. Edmondson Oil Co.*, 457 U.S. 922 (1982), and as co-conspirators with a state adjudicator under *Dennis v. Sparks*, 449 U.S. 24 (1980); under the Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 411(a)(1), (a)(2), (a)(5), 412, and 529; under Article I, §§ 8, 9, and 11 of the New York State Constitution; under New York Civil Service Law § 75-b (the New York State Whistleblower Law for Public Employees); under New York Labor Law § 740 (the New York State Whistleblower Law as applied to private labor organizations); and under New York Labor Law § 201-d (protection of lawful off-duty political and recreational activity).

3. TWU Local 100 is not alleged to be a state actor merely because it is a public-employee union. It acted under color of state law because it was a willful participant with NYCTA and its officials in the specific retaliatory deprivations alleged here. NYCTA and TWU Local 100 coordinated their conduct, communicated with one another concerning Plaintiff, and used their respective authority over Plaintiff's employment and his elected union office to punish Plaintiff for the same protected speech. The clearest example is the Union's adjudication of charges brought against Plaintiff by a vice president of the union Defendant Donald Yates ("Yates Charges"). Plaintiff was punished for his April 2026 bus-safety reporting after the Union's Trial Committee found that the reporting had caused NYCTA management to retaliate against the Union by revoking agreements, cutting overtime, and disciplining members; and the Union then used those consequences as the basis for removing Plaintiff from office. That is a direct connection between NYCTA's retaliation and the Union's punishment of Plaintiff, constituting joint action.

4. The conduct alleged in this Complaint follows a single pattern. NYCTA and TWU Local 100 each maintain a facially regular disciplinary system, complete with written rules, notice, hearings, arbitrators, trial committees, and appeals. For ordinary matters that system operates in the ordinary way. By contrast, when the subject is a whistleblower or dissident, an alternate track of the system is followed to protect the NYCTA and TWU Local 100 from exposure: charges are stockpiled and back-dated, hearings are expedited or hidden from the calendar, legal defenses entitled to legally mandatory consideration are never raised, penalties are imposed before appeals conclude despite sworn assurances otherwise , and the institutions' enforcers are shielded from discipline for violence against the dissident. The first track exists to lend legitimacy to the second. The facts alleged below describe that two-track system in four phases: (I) surveillance and delegitimization of Plaintiff by NYCTA management; (II) intimidation and violence by TWU Local 100 officers, followed by NYCTA's ratification of that violence; (III) a rigged arbitration that laundered a retaliatory termination; and (IV) prior restraint, internal prosecution, and removal from elected office by the Union's successor administration, coordinated with and driven by NYCTA management's displeasure with Plaintiff's public-safety reporting.

5. On February 21, 2023, approximately three weeks after then-TWU Local 100 President Richard Davis ("Richard Davis") publicly read one of Plaintiff's private text messages at a mass-membership meeting attended by thousands and signaled that "action would be taken" against members who made similar remarks, two TWU Local 100 officers on Richard Davis's payroll, Canella Gomez and Brian Davis, came to Plaintiff's authorized break room at the Bedford Park subway station and broke his leg. Plaintiff sustained two

fractures of the tibia and fibula, multiple facial fractures, and required four surgeries and months of rehabilitation. Essentially, Plaintiff had to learn how to walk again.

6. Public employer NYCTA then treated the victim worse than the perpetrators. Plaintiff was suspended without pay. Plaintiff, who suffered bone fractures, was prosecuted on the same misdemeanor assault charge as the man who caused his injuries. NYCTA refused to require Gomez to undergo a drug or alcohol test, even though Plaintiff smelled the odor of alcohol coming from Gomez. Gomez was never taken out of service. Brian Davis was never investigated or taken out of service.

7. NYCTA and TWU Local 100 coordinated a closed arbitration lacking notice of the Gomez matter. Plaintiff was not advised of the proceeding. Ultimately, Gomez received no meaningful discipline. While he received a mere thirty (30) day suspension, he has yet to serve his suspension. Any other employee would have been terminated under the same circumstances of being involved with the breaking of a fellow worker's legs.

8. While Plaintiff was still on workers' compensation leave recovering from his injuries from the assault, NYCTA proceeded to conduct expedited disciplinary proceedings against him based upon on social media "misconduct" charges. Employees are rarely, if ever, required to appear for disciplinary hearings while they are on worker's compensation leave.

9. All charges against Plaintiff have arisen from information gained from longstanding surveillance commanded by Defendant Paul McPhee ("McPhee"), Chief Officer of Subways, who directed General Superintendent Defendant Chris Basile ("Basile") to instruct subordinate managers to "surveil" Plaintiff and "hang" his black employee for "anything they could find."

10. On August 19, 2024, after an arbitration in which the union deliberately failed to call critical exonerating witnesses, deliberately failed to raise the whistleblower defense under New York Civil Service Law § 75-b, and deliberately failed to introduce well-known First Amendment authority that Plaintiff had hand-delivered to union counsel, Plaintiff's termination was upheld by the arbitrator.

11. The timing was not coincidental. Plaintiff's termination was rushed to completion before the upcoming TWU Local 100 election so that Plaintiff, the union's most prominent internal political opponent and the founder of the dissident slate "Progressive Action," would be ineligible to run against the Richard Davis administration.

12. The retaliation did not end with Plaintiff's termination. On May 21, 2026, the current President of TWU Local 100, Defendant John V. Chiarello ("Chiarello"), issued a formal written warning to Plaintiff on official TWU Local 100 letterhead, threatening internal union discipline because Plaintiff posted a video on or about Sunday, May 17, 2026, that included or arose out of Plaintiff's public-interest interview with a candidate for statewide office in New York. This warning also followed Plaintiff's April 1, 2026 posting on his Progressive Action platform of a video addressing unsafe conditions of MTA buses being placed into revenue service in disregard of public safety.

13. In his May 21, 2026 letter, Chiarello demanded that "all communications related to the contract must be vetted through the President's Office," told Plaintiff that he is "not an autonomous actor," and warned that "continued misconduct could lead to further action in accordance with our Constitution and By Laws." That warning is, on its face, an unconstitutional prior restraint on protected citizen speech, an attempted suppression of Plaintiff's political association with a candidate for statewide office, a violation of New

York Labor Law § 201-d, and an act of retaliation against Plaintiff for whistleblowing about a substantial and specific danger to public health and safety in violation of New York Civil Service Law § 75-b and New York Labor Law § 740. More importantly, it constitutes another installment in the continuing course of retaliatory conduct alleged below.

14. Then, on September 1, 2026, twelve days after this Court denied Plaintiff's application for a temporary restraining order in reliance on Union counsel's sworn representation that "[n]o penalty is imposed until" the Union's internal appellate process is completed (ECF No. 23 ¶ 31), and after internal "trials" that the Union convened at 11:00 a.m. on the very morning of the August 20, 2026 hearing before this Court, TWU Local 100's Executive Board removed Plaintiff from the office of Vice President of Rapid Transit Operations ("RTO") to which the members had elected him, and declared him ineligible to hold any elective or appointive position in Local 100 for three years. The Union imposed that penalty in two separate matters decided the same day, *Yates, et al. v. Thompson* and *Bernabel v. Thompson*, without awaiting the appeal to the International Union that its counsel had told this Court would precede any penalty.

15. The Union's decision as to the Yates Charges rests expressly on Plaintiff's April 1, 2026 bus-safety video. The Union's Trial Committee found that Plaintiff's public reporting caused NYCTA management to "retaliate against the Union," to revoke agreements with Union representatives, to cut overtime, and to impose discipline on members, and it removed Plaintiff from office on that basis. In other words, the Union punished Plaintiff because NYCTA management punished the Union for Plaintiff's protected speech. That finding, made by the Union itself, is the joint action alleged in this Complaint reduced to writing. In a third matter decided the same day by the same tribunal, *Argueta v. Thompson*,

the Union exonerated Plaintiff of every charge, including charges that he had reported Family and Medical Leave Act ("FMLA") issues to the United States Department of Labor and had communicated with the United States Department of Health and Human Services about the handling of members' medical information. The Union's decision to punish the public-safety speech that offended management, , confirms that the sanction was driven by the content of Plaintiff's speech and by management's reaction to it.

16. Plaintiff was terminated for speech that he made (i) on his own personal social-media platforms; (ii) on his own time, off-duty; (iii) not pursuant to any official job duty of a subway conductor; (iv) addressed to matters of unambiguous public concern, including sexual assault on transit property, alleged nepotism by an Assistant Chief Officer of Transportation, supervisor abuse of minority subordinate employees, and the conduct of a publicly funded transit agency that carries millions of New Yorkers every day.

17. In Plaintiff's companion arbitration award (DAN 24-2303-0025), the same arbitrator who upheld Plaintiff's termination for this protected speech expressly recognized, "Transit employees do not surrender their First Amendment right to free speech when they become Transit employees," and accordingly reduced the proposed termination penalty in that companion case to a 15-day suspension. This recognition came just ten days earlier on August 9, 2024. The disparate treatment between the two awards, decided by the same arbitrator within ten days, demonstrates that the termination award was the product of viewpoint discrimination and retaliation rather than principled application of any neutral rule.

18. Plaintiff seeks compensatory damages, punitive damages, equitable reinstatement to his employment and to his elected office, back pay, front pay, declaratory relief, attorneys'

fees under 42 U.S.C. § 1988 and 29 U.S.C. § 412, and such further relief as this Court deems just.

## JURISDICTION AND VENUE

19. This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a)(3)–(4), because this action arises under 42 U.S.C. § 1983 and the First and Fourteenth Amendments to the United States Constitution, and under 29 U.S.C. § 412, because this action arises under Title I of the Labor Management Reporting and Disclosure Act. Jurisdiction under §§ 1331 and 1343 over the claims against TWU Local 100 and its officers does not rest on any contention that the Union is a state actor by reason of its status. It rests on the allegations, pleaded with particularity below, that the Union and its officers were willful participants in joint activity with NYCTA and its officials, which is state action attributable to every participant in it. *Hughes v. Patrolmen's Benevolent Ass'n of the City of New York, Inc.*, 850 F.2d 876, 880–81 (2d Cir. 1988); *see also Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *United States v. Price*, 383 U.S. 787, 794 (1966).

20. This Court has supplemental jurisdiction over Plaintiff's state law claims under 28 U.S.C. § 1367(a) because those claims form part of the same case or controversy as the federal claims and derive from a common nucleus of operative fact. *See United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725 (1966).

21. Plaintiff's First Amended Verified Complaint (ECF No. 7) pleaded, as its Twelfth Cause of Action, a claim under the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1962(c) and (d), and sought relief under 18 U.S.C. § 1964. Plaintiff withdraws that cause of action without prejudice. The factual allegations previously pleaded in support of it are retained in this Second Amended Verified Complaint because they are material to

the remaining claims, including the claims of joint action and conspiracy under 42 U.S.C. § 1983 and the claims of retaliation under the Labor Management Reporting and Disclosure Act and New York law. Nothing in this pleading is an abandonment of those facts, and Plaintiff reserves the right to seek leave to replead any withdrawn claim, under Federal Rules of Civil Procedure 15 and 16, should discovery warrant.

22. Venue is proper in the Eastern District of New York under 28 U.S.C. § 1391(b) because the New York City Transit Authority maintains its principal place of business in Kings County (130 Livingston Street, Brooklyn, New York), TWU Local 100 maintains its principal office in Kings County (195 Montague Street, Brooklyn, New York), and a substantial part of the events giving rise to the claim, including Plaintiff's disciplinary proceedings and termination, the coordinated arbitrations, the internal union trials and Executive Board decisions, and the continuing retaliatory threats issued from TWU Local 100's Brooklyn headquarters, occurred in this District.

23. New York notice-of-claim requirements do not apply to Plaintiff's federal civil rights claims. Plaintiff's claims under New York Civil Service Law § 75-b, New York Labor Law § 740, and New York Labor Law § 201-d are governed by their own statutory schemes and likewise do not require a Notice of Claim.

24. To the extent that any Notice of Claim was required for any claim against NYCTA, the continuing violation doctrine extends the limitations and notice periods through the most recent retaliatory acts of May 21, 2026, and September 1, 2026, and Plaintiff has otherwise complied with any applicable statutory pre-suit conditions.

## PARTIES

25. Plaintiff TRAMELL THOMPSON is a Black male resident of Kings County, New York. He was employed by NYCTA as a Conductor from approximately 2013 until his termination on August 19, 2024, a span of approximately ten years. He is the founder and operator of "Progressive Action," a labor and public-interest journalism organization with public presences on YouTube, Facebook, Instagram, X (Twitter), and TikTok dedicated to reporting on safety, corruption, and worker treatment at NYCTA and the Metropolitan Transportation Authority ("MTA").

26. Plaintiff is also a member in good standing of TWU Local 100. In the Union's December 12, 2024 general election, running off-slate against the incumbent administration, Plaintiff was elected by the members of the RTO Department to the office of Vice President of RTO.. Gomez was the incumbent RTO Vice President whose office Plaintiff won. Plaintiff took office in or about January 2025 and served as a compensated officer of TWU Local 100, receiving salary and benefits from the Union, until the Executive Board purported to remove him on September 1, 2026.

27. Defendant NEW YORK CITY TRANSIT AUTHORITY ("NYCTA") is a public-benefit corporation organized under the New York Public Authorities Law and is the operating subsidiary of the MTA responsible for the operation of the New York City subway and bus systems. NYCTA is a "person" acting under color of state law for purposes of 42 U.S.C. § 1983 and is amenable to suit for its own unconstitutional policies, customs, and practices under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Its principal place of business is 130 Livingston Street, Brooklyn, New York 11201.

28. Defendant TRANSPORT WORKERS UNION OF GREATER NEW YORK, LOCAL 100 ("TWU Local 100" or the "Union") is an unincorporated labor organization with its principal office at 195 Montague Street, 3rd Floor, Brooklyn, New York 11201. TWU Local 100 is the exclusive collective-bargaining representative of NYCTA conductors and operators under the New York Civil Service Law (Taylor Law), and is a "labor organization" within the meaning of 29 U.S.C. § 402(i). TWU Local 100 is not alleged to be a state actor merely because it is a public-employee union. It acted under color of state law because, as alleged with particularity below, it and its officers were willful participants with NYCTA and its officials in the specific retaliatory deprivations alleged in this Complaint and because the instruments it used, including the Taylor Law disciplinary process and its officers' NYCTA-paid release time, are rights and privileges created by the State. TWU Local 100 is therefore a state actor for purposes of 42 U.S.C. § 1983 as to the conduct alleged below.

29. Defendant RICHARD DAVIS is sued individually and in his official capacity. From approximately December 2022 through his resignation on or about January 31, 2025, Davis served as President of TWU Local 100. As President, Davis had authority under Article III of the Local 100 By-Laws to appoint, direct, suspend, remove, and fix the compensation of the Union's employees, including Defendants Gomez and Brian Davis, who were on the Union staff payroll under his direction when they assaulted Plaintiff; to direct the Union's legal counsel, including the counsel who represented Plaintiff in the 2024 arbitration; and to determine whether the Union would initiate internal charges against Gomez or seek judicial review of the arbitration award terminating Plaintiff. Davis resided and worked in this District.

30. Defendant JOHN V. CHIARELLO is sued individually and in his official capacity. Chiarello is the current President of TWU Local 100, having succeeded Defendant Davis on or about February 1, 2025. Chiarello presides over the Executive Board that voted to remove Plaintiff from office and issued the July 31, 2025 and May 21, 2026 directives alleged below. Chiarello directed legal counsel to draft and create charges and findings to have Thompson discharged and simultaneously directing legal counsel to oppose and support the MTA in the State Court proceedings and appeals against Thompson.

31. Defendant CANELLA GOMEZ is sued individually and in his official capacity. At all times relevant, Gomez was a Vice President of TWU Local 100 (the Vice President of RTO), a member of the Union staff under President Davis, and an employee paid by NYCTA.

32. Defendant BRIAN DAVIS is sued individually and in his official capacity. At all times relevant, Brian Davis was an officer of TWU Local 100.

33. Defendant PAUL MCPHEE is sued individually and in his official capacity. At all relevant times, McPhee was the Chief Officer of Subways at NYCTA, and Plaintiff is informed and believes McPhee was the highest-ranking operational officer in the chain of command above him and a final policymaker for NYCTA with respect to the surveillance, investigation, and discipline of subway employees.

34. Defendant CHRIS BASILE is sued individually and in his official capacity. At all relevant times Basile served as General Superintendent.

35. Defendant DONALD YATES is sued individually and in his official capacity. At all relevant times, Yates served as Vice President of TWU Local 100.

36. Defendant GARY ROSARIO is sued individually and in his official capacity. At all relevant times, Rosario served as Vice President of TWU Local 100.

37. Defendant SCOTT STEINBERG is sued individually and in his official capacity. At all relevant times, Steinberg served as Division Chairman of TWU Local 100.

38. Defendant DANIEL ASCONA is sued individually and in his official capacity. At all relevant times, Ascona served as Division Chairman of TWU Local 100.

39. Defendant JESSE ARGUETA is sued individually and in his official capacity. At all relevant times, Argueta served as Executive Board Member of TWU Local 100.

40. Defendant CARLOS BERNABEL is sued individually and in his official capacity. At all relevant times, Bernabel served as Secretary-Treasurer of TWU Local 100.

41. Defendants JOHN AND JANE DOES 1–10 are persons currently unknown to Plaintiff who, acting individually and/or in concert with one or more of the named Defendants, participated in the surveillance, disciplinary targeting, arbitration manipulation, internal union prosecution, Executive Board removal vote, and physical assault of Plaintiff in violation of his rights. They include the members of NYCTA's "Social Media Review Committee," and those members of the TWU Local 100 Executive Board who voted on or about August 31, 2026, to remove Plaintiff from office. Their identities will be ascertained through discovery. Plaintiff does not, by this paragraph, allege that every member of the Executive Board acted willingly. As alleged below, at least one member has stated that he voted to bring the charges because he had no choice, and after the trials others said anonymously that they opposed what was being done to him.

42. Non-party co-conspirators. Arbitrator Stephen F. O'Beirne, who presided over the arbitration that terminated Plaintiff under the Taylor Law disciplinary mechanism, and the members of the TWU Local 100 Trial Committee that heard the Yates, Bernabel, and Argueta charges (Michael Capocci, Vanessa Jones, Grigoriy Dunichev, and alternate Christopher Canty), are not named as defendants. Plaintiff alleges, as set forth below, that O'Beirne and the Trial Committee were participants in the conduct that deprived Plaintiff of his rights, and that the named Defendants conspired with them. Under *Dennis v. Sparks*, 449 U.S. 24 (1980), private parties who conspire with an adjudicator act under color of state law and are liable under 42 U.S.C. § 1983 notwithstanding the adjudicator's own immunity from damages, and the adjudicator's immunity does not shield the conspiracy from discovery.

## STATEMENT OF FACTS

**Plaintiff's Decade of Public-Interest Speech as a Private Citizen**

43. Plaintiff was hired by NYCTA as a Conductor on or about September 29, 2013. His sworn job duties are limited to the safe operation of subway trains, announcement of station stops, opening and closing of train doors, customer interaction, and observance of NYCTA Rules and Regulations relating to the operation of revenue equipment. At no point has "speaking publicly about the MTA" ever been within Plaintiff's official duties of a Conductor.

44. At all relevant times herein and over the course of many years, Plaintiff personally attended MTA public meetings at which he frequently raised concerns before management and brought management's and the public's attention to issues such as labor relations, public transportation, public safety, union democracy, government accountability, public policy affecting transit workers and the public, and political matters. Plaintiff alleges that many

of these issues affected rank-and-file transit workers and the riding public and that public attention was often directed toward those issues only after individuals such as Plaintiff brought them into the open.

45. At all times relevant herein and over the course of many years, Plaintiff became an active participant in activism and citizen journalistic activity relating to labor relations, public transportation, public safety, union democracy, government accountability, and public policy affecting transit workers and the riding public, along with political matters more generally. Plaintiff regularly engaged in public advocacy, labor reform efforts, political activities, citizen journalism, whistleblowing, and commentary on matters of substantial public concern. Plaintiff's speech activity in these areas was engaged in via social media including without limitation YouTube, TikTok, and Facebook, along with other forms of publication, speech, and advocacy.

46. Beginning in approximately 2015 - 2016, while serving as a Shop Steward for the NYCTA, Plaintiff founded "Progressive Action". Progressive Action was, and is, a privately operated independent labor and public-interest media platform. Plaintiff did not, and does not, receive any compensation, instruction, or direction from NYCTA in connection with Progressive Action. He produced content on his own time as a private citizen, using his own equipment, on his own social-media accounts, and did not engage in this activity on behalf of the NYCTA or TWU Local 100.

47. Since approximately 2017, Plaintiff has operated Progressive Action and related media platforms focusing on labor issues, transportation, workplace safety, government accountability, public corruption, and matters affecting transit workers and the riding public. Through videos, livestreams, podcasts, interviews, and social media content,

Plaintiff has developed a substantial audience consisting of transit workers, union members, labor activists, elected officials, journalists, and members of the public. By 2026, Plaintiff's platforms have accumulated tens of thousands of followers and generated millions of views and engagements. Plaintiff's reporting and commentary regularly reaches employees throughout the NYCTA, members of TWU Local 100, elected officials, and members of the media. His content frequently becomes the subject of discussion among NYCTA management personnel, union officials, public officials, and transit workers. Through his work with Progressive Action and related media platforms, Plaintiff has developed a public profile extending well beyond his official employment duties. In particular, Plaintiff has become a recognizable voice among transit workers, labor activists, union members, candidates for union office, public officials, political figures, and members of the public interested in transportation and labor issues.

48. Plaintiff has used Progressive Action as an independent forum through which transit workers, whistleblowers, reform advocates, union dissidents, and other individuals could discuss issues affecting the transit workforce and the riding public. Unlike official management communications or official union publications, Progressive Action frequently provided a platform for viewpoints that were critical of both NYCTA management and incumbent TWU Local 100 leadership.

49. Plaintiff's speech has consistently addressed matters of public concern, including but not limited to: (a) supervisor harassment of Black and Hispanic workers; (b) crimes on the transit system; (c) homeless persons sleeping and using illicit substances in employee-only locker rooms; (d) lewd public acts witnessed by riders on revenue equipment; (e) nepotism and money-lending arrangements between Assistant Chief Officers of Transportation; (f)

lack of reasonable-accommodation positions for pregnant workers; (g) the personal safety failures of the MTA; and (h) the racially disparate application of NYCTA's disciplinary policies.

50. Over time, Plaintiff has reported on and commented upon numerous issues affecting transit workers and the public, including workplace safety, crime in the transit system, labor relations, collective bargaining issues, union elections, public accountability, alleged favoritism, alleged corruption, alleged abuses of authority, alleged misconduct by management officials and union officers, and other matters of public concern. The subjects covered through Progressive Action have included, but were not limited to, subway crime, assaults on transit workers, public safety, two-person train crew safety, one-person train operation ("OPTO"), bus maintenance and brake safety concerns, Gun Hill Depot safety issues, accommodations for pregnant employees, attendance and disciplinary practices, lunch relief and crew scheduling issues, workplace safety complaints, environmental and sanitation issues at transit facilities, contractor flagging safety enforcement, civil service hiring practices, labor negotiations, union elections, retaliation against whistleblowers, the Insight App and employee surveillance concerns, LIRR labor disputes, congestion pricing, and other issues involving public transportation policy, labor rights, government accountability, and the safety of both employees and the riding public.

51. Plaintiff has also interviewed transit workers, labor activists, union candidates, elected officials, political figures, and other individuals possessing information concerning labor relations, transportation policy, public safety, government accountability, and issues affecting the transit workforce. Through those interviews and broadcasts, Plaintiff has amplified viewpoints and information that might otherwise not have been communicated

to transit workers or the public. As his audience grew, Plaintiff interviewed and interacted with numerous public officials, labor leaders, candidates for office, transit workers, whistleblowers, and individuals involved in matters of public concern. These included Brooklyn Borough President Antonio Reynoso, New York State Senator Kevin Parker, Public Advocate Jumaane Williams, former NYPD officer Edwin Raymond, multiple candidates for union office, labor activists, transportation advocates, and individuals affiliated with national political campaigns, including the Robert F. Kennedy Jr. presidential campaign. Through these interviews and public discussions, Progressive Action became a recognized platform for discussion of labor, transportation, public safety, and government accountability issues. These interviews frequently involved matters of public concern and provided a forum for perspectives that may not otherwise have received public attention.

52. Plaintiff's coverage has repeatedly drawn the attention of mainstream media organizations, including Pix 11, Fox News, and the New York Post. His coverage has also drawn the attention of elected officials and NYCTA's senior management. As early as 2017, Plaintiff’s reporting activities had come to the attention of senior NYCTA management. NYCTA Vice President of Subway Service Delivery Barry Greenblatt admitted as much to Plaintiff when, in 2017, he informed Plaintiff that he had viewed his content. As Plaintiff's audience, reach, and visibility increased, so too did management's attention to his activities. Plaintiff alleges that management officials increasingly monitored, discussed, and reacted to his reporting, commentary, whistleblowing activities, election coverage, and public advocacy. Plaintiff became aware on multiple occasions that NYCTA management personnel were monitoring, reviewing, discussing, and responding to his public reporting

and social media activity. Management officials questioned Plaintiff regarding content that he published through Progressive Action. His videos, broadcasts, social media posts, and public statements were referenced during investigations, disciplinary proceedings, and other employment-related matters. Based upon statements made by management personnel, disciplinary records, investigative actions, and other circumstances, Plaintiff believes that NYCTA officials regularly monitored his public activities and maintained awareness of his reporting and commentary.

53. Plaintiff's reporting has not been confined to social media. When the conduct he uncovered fell within the jurisdiction of a governmental body or law-enforcement agency, Plaintiff took it there. Each of the reports described in the following paragraphs conveyed truthful information that Plaintiff had personally observed, experienced, or documented; each concerned conduct within the receiving agency's authority to investigate or remedy; and, as alleged below, Defendants learned of each of them and, in several instances, cited the reports themselves as grounds for discipline.

54. On February 21, 2023, Plaintiff reported to the NYPD, at the scene and thereafter, the assault committed on him in the Bedford Park crew room by Defendants Gomez and Brian Davis, including the kicks that fractured his leg, the blows that fractured his face, and Gomez's statement that he had been sent to "do [Plaintiff] dirty." .] Plaintiff has also reported to the NYPD, and has publicly documented, crimes committed on the transit system and on NYCTA property, including the presence of unauthorized persons in employee-only areas.

55. Plaintiff reported to the MTA Office of the Inspector General the money-lending and nepotism arrangements among Assistant Chief Officers of Transportation that he made

public in January 2022, arrangements under which subordinates were indebted to the supervisors who controlled their assignments and discipline. The OIG had investigated allegations of the same kind in 2018. No Assistant Chief Officer was disciplined. Plaintiff also brought to the OIG's attention the operation of trains in an NYCTA yard by persons who were neither authorized nor credentialed to operate them, a matter that NYCTA never investigated.

56. Plaintiff filed two complaints with the New York State Division of Human Rights against NYCTA and the MTA, Case Nos. 10237181 and 10239572. Those complaints alleged that NYCTA applied its disciplinary policies to Black employees, and to Plaintiff in particular, more harshly than to white employees engaged in comparable or worse conduct; that NYCTA had suspended Plaintiff without pay and cross-charged him after he was the victim of a workplace assault while leaving his assailants in service; and that NYCTA's discipline of Plaintiff was retaliation for his public reporting on racially disparate discipline and on the harassment of Black and Hispanic workers by supervisors.

57. On December 12, 2023, Plaintiff filed an improper-practice charge against TWU Local 100 with the New York State Public Employment Relations Board, Case No. U-39638. The charge alleged that the Union had breached its duty of fair representation by, among other things, handling the Gomez disciplinary arbitration in a closed proceeding without notice to Plaintiff, the victim, and by failing to pursue Plaintiff's own grievances arising from the assault and his suspension. Plaintiff later amended the charge to allege that the Union had refused to seek judicial review under CPLR Article 75 of the August 19, 2024 award terminating his employment, leaving Plaintiff to bring that proceeding himself.

58. Plaintiff reported to the United States Department of Labor violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq., specifically that TWU Local 100 members were experiencing significant delays (i.e., months) in the processing and approval of their FMLA requests. Plaintiff personally visited the Department of Labor accompanied by members whose applications had been affected by the delays. The Union knew of this report: the internal charges filed against Plaintiff by Defendant Argueta on May 20, 2025, expressly charged him for it.

59. Plaintiff reported to the United States Department of Health and Human Services ("HHS") what he believed were violations at the MTA Medical Assessment Center ("MAC") in the handling of members' medical information. Plaintiff raised concerns regarding what he believed to be violations of workers' HIPAA/privacy rights and other protections. The Union knew of this report as well: the Argueta charges expressly charged Plaintiff for his communications with HHS.

60. Plaintiff reported to the New York State Department of Labor's Public Employee Safety and Health Bureau ("PESH") unsafe practices and working conditions affecting NYCTA train crews. Plaintiff raised train crew safety issues and sought intervention regarding unsafe Transit practices affecting train crews.

61. Plaintiff has also brought the conditions he reports on directly to elected officials and candidates for public office, including Brooklyn Borough President Antonio Reynoso, State Senator Kevin Parker, Public Advocate Jumaane Williams, and candidates for statewide office, both in on-the-record interviews and in private communications. Plaintiff has publicly and repeatedly stated his intention to bring the conditions he reports on to the

attention of state and federal authorities, and Defendants, who monitored his platform, were aware of that intention.

62. Much of the conduct Plaintiff has exposed relates to the commission or possible commission of federal offenses. NYCTA is a recipient of federal transit funds. The money-lending and nepotism arrangements among Assistant Chief Officers of Transportation that Plaintiff reported in January 2022 concern the conduct of agents of an organization receiving federal program funds within the meaning of 18 U.S.C. § 666. The operation of NYCTA equipment by unauthorized and uncredentialed persons and the placement of buses with defective brakes and steering into revenue service concern the safety of a federally funded transit system regulated by the Federal Transit Administration. The handling of members' medical information at the MTA Medical Assessment Center, which Plaintiff reported to the HHS, concerns the possible wrongful disclosure of individually identifiable health information within the meaning of 42 U.S.C. § 1320d-6. And the violence, cover-up, and retaliation directed at Plaintiff himself, described below, concern possible violations of 18 U.S.C. §§ 241, 242, 1512, and 1513. At all relevant times there was a reasonable likelihood that Plaintiff's communications concerning these matters would reach, and in several instances did reach, federal law enforcement officers and federal agencies. Moreover, Defendants knew of the reasonable likelihood. Plaintiff's platform was followed by elected officials, candidates for statewide and federal office, and reporters; and Plaintiff publicly and repeatedly stated his intention to bring the conditions he reported to the attention of state and federal authorities.

63. Defendants' efforts to silence Plaintiff, as alleged below, were undertaken with the intent to hinder, delay, and prevent those communications to federal authorities, and, once

Plaintiff had made such communications, to punish him for having made them and to interfere with his employment and livelihood on that account.

64. Before going public, Plaintiff repeatedly attempted to raise his concerns through internal channels, including supervisors and the union. Those concerns were ignored or buried. Plaintiff turned to public reporting only after exhausting internal avenues of redress.

65. As Plaintiff's audience, influence, and visibility grew, Plaintiff became known as an outspoken and independent critic of both NYCTA management and incumbent union leadership. Plaintiff frequently challenged official narratives, questioned the actions of individuals in positions of authority, publicized allegations of misconduct and wrongdoing, promoted reform candidates and reform efforts, covered contested union elections, and provided a public platform for criticism of institutional decisionmakers. Plaintiff alleges that public discussion of such issues was often met with greater resistance than the underlying issues themselves.

66. Plaintiff's activities increasingly placed him at odds with individuals occupying positions of authority within both NYCTA and TWU Local 100. Plaintiff alleges that Defendants viewed him not simply as an employee, but as a persistent and influential critic whose reporting, commentary, whistleblowing activities, election coverage, public advocacy, and growing influence within the transit labor community threatened entrenched institutional interests and subjected Defendants' conduct to public scrutiny. Plaintiff alleges that his growing reach derived in substantial part from his willingness to criticize both NYCTA management and incumbent union leadership when he believed their actions conflicted with the interests of rank-and-file transit workers. Unlike institutional actors whose interests often converged around preserving existing practices and relationships, Plaintiff

operated independently and publicly advocated for reform, accountability, and greater responsiveness to the concerns of union members. Plaintiff's reporting, election coverage, whistleblowing activities, and reform advocacy frequently focused on issues that he believed were adversely affecting rank-and-file workers and receiving insufficient attention from both management and incumbent union leadership. Accordingly, as Plaintiff’s reporting and public advocacy expanded, he experienced increased hostility from management and others over his speech, whistleblowing activities, public commentary, and labor advocacy. Following Plaintiff’s reporting on workplace safety, labor issues, public corruption, management practices, and matters of public concern, Plaintiff was subjected to increased scrutiny, investigations, disciplinary actions, surveillance, monitoring of his social media activity, and other adverse treatment. The timing and nature of these actions led him to believe that his protected speech and whistleblowing activities were substantial motivating factors in the actions taken against him.

67. Plaintiff alleges that Defendants frequently viewed public scrutiny of institutional problems as a greater threat than the institutional problems being scrutinized. As a result, Plaintiff's reporting, commentary, and whistleblowing activities increasingly drew attention not because they created problems, but because they exposed problems that already existed. Accordingly, Plaintiff alleges that the surveillance, investigations, monitoring of his speech, disciplinary proceedings, retaliatory actions, termination of employment, post-termination threats, union charges, speech restrictions, and other adverse actions described herein did not arise in isolation. Rather, they formed part of a broader course of conduct directed toward Plaintiff because of his reporting, commentary,

whistleblowing activities, election coverage, labor reform efforts, public advocacy, and exercise of rights protected by the First Amendment to the United States Constitution.

68. All of Plaintiff's speech, including the speech that NYCTA later cited as the basis for his termination, was made (i) outside of working hours, (ii) off NYCTA premises, (iii) without use of NYCTA equipment, and (iv) not pursuant to any official duty of a Conductor.

69. All of Plaintiff's speech therefore constitutes both "recreational activit[y]" and "political activit[y]" as defined by New York Labor Law § 201-d(1)(a)-(c) to the extent so categorized. All of Plaintiff's speech is protected First Amendment citizen speech on matters of public concern.

**Phase I: Covert Surveillance and the Delegitimization of Plaintiff by NYCTA Management (2020–2024)**

70. Management's targeting of Plaintiff predates 2020. Upon information and belief, as early as 2018, NYCTA supervisors referred to Plaintiff among themselves by code words in their communications concerning him, including the inflammatory and derogatory term "red meat." This term was used in emails with Defendant McPhee and Lenny Akselrod to describe Thompson. Supervisors do not assign a code name to a rank-and-file conductor unless he has been singled out for their attention. The use of a dehumanizing label to refer to Plaintiff, years before any disciplinary charge was brought against him and while he was already publicly reporting on conditions at NYCTA, reflects the animus with which management regarded him and shows that the surveillance program formalized in 2020 was the continuation of an existing practice, not a response to any misconduct.

71. In or about January 2020, Plaintiff was interviewed by NYCTA's Division of Special Investigations and Review ("SIR"). During that interview Plaintiff identified two NYCTA

managers, Isaac Thompson and Aikido Sticatto ("Sticatto"), who possessed information relevant to the matters under review, including information that Plaintiff was being targeted and surveilled by management. Upon information and belief, SIR interviewed neither of them. In 2020, Isaac Thompson had information that Plaintiff was being targeted, and Sticatto knew that Plaintiff was being surveilled and targeted by management. On two separate occasions, therefore, SIR declined to interview the individuals with the most direct knowledge of the targeting of Plaintiff. Instead, within months, senior NYCTA management had made Plaintiff the subject of surveillance. The January 2020 interview placed NYCTA on notice that Plaintiff was a source of information about managerial misconduct, and it marks the point at which NYCTA's investigative attention shifted from the misconduct Plaintiff reported to the person who reported it.

72. In the summer of 2020, Sticatto approached Plaintiff in person in the Stillwell Avenue Terminal crew room. Although Sticatto barely knew Plaintiff, Sticatto told Plaintiff that he had been called to Basile's office where Sticatto had learned that McPhee had ordered that Plaintiff be surveilled. McPhee wanted to "hang" Plaintiff for anything subordinate managers could find. Basile had also told Sticatto to cease any contact with Plaintiff. Plaintiff was initially skeptical of Sticatto's account.

73. Throughout 2020, Sticatto informed Plaintiff that senior NYCTA management personnel, including McPhee, Assistant Chief Transportation Officer Charles Henschke, ("Henschke"), Basile, and Assistant Chief Transportation Officer of the Rail Control Center Ronald Lloyd ("Lloyd"), regularly discussed Plaintiff, his activities, and his growing public influence. According to Sticatto, Plaintiff was repeatedly identified as a target for investigation, discipline, surveillance, and heightened scrutiny. According to

Sticatto, management's focus was directed less toward investigating the substance of Plaintiff's criticisms than toward identifying a basis upon which Plaintiff himself could be investigated, disciplined, or removed. Sticatto advised Plaintiff that management officials discussed efforts to "bring him down" and were actively seeking information that could be used against him. Sticatto further represented that he was disturbed by the nature of these discussions and, for that reason, attempted to document certain meetings and conversations. Plaintiff is informed and believes that the investigations, surveillance, disciplinary actions, and other adverse treatment that subsequently occurred were substantially consistent with the warnings and information provided by Sticatto.

74. Weeks later, at Plaintiff's Workers' Compensation hearing, the MTA disclosed that it had hired private investigators to follow Plaintiff's vehicle and photograph him in an effort to manufacture a workers' compensation fraud case. Plaintiff prevailed at the original hearing and on appeal. Independent confirmation of the surveillance corroborated Sticatto's account and led Plaintiff to credit the remainder of what Sticatto had told him.

75. Throughout 2020, McPhee, Henschke, Basile, and Lloyd held regular meetings at which Plaintiff was discussed as a target, including but not limited to discussions of proposals to "bring [him] down." Sticatto attempted to record these conversations because he was disturbed by what he was hearing. Sticatto was himself subsequently retaliated against for his perceived association with Plaintiff. Upon information and belief, NYCTA maintained a process through which management personnel monitored and reviewed employee social media activity, including content published by Plaintiff through Progressive Action. His videos, broadcasts, interviews, social media posts, and other public communications were repeatedly reviewed and discussed by management personnel. Upon information and

belief, information gathered through these monitoring activities was utilized in investigations, disciplinary actions, and other employment-related decisions affecting Plaintiff. The full structure, membership, records, and operation of any such social media review process remain within the possession, custody, and control of NYCTA and its officials.

76. Plaintiff is informed and believes, and on that basis alleges, that NYCTA created a so-called "Social Media Review Committee" whose true purpose was not policy enforcement but surveillance of Plaintiff's constitutionally protected speech and the speech of other whistleblowers like him. The Committee's membership was never disclosed; Plaintiff's union representatives were denied the opportunity to cross-examine Committee members at arbitration; and the Committee appears to have been created for the express purpose of building a discipline file against Plaintiff and other whistleblowers. The full structure, membership, records, and operation of any such social media review process remain within the possession, custody, and control of NYCTA and its officials.

77. Upon information and belief, from 2020 forward NYCTA management, including McPhee and Basile, communicated with TWU Local 100 officers concerning Plaintiff, his Progressive Action reporting, and management's intention to build a disciplinary case against him. Those communications occurred in the ordinary course of the labor-management relationship, through Labor Relations, through officers on release time who reported to both institutions, and in meetings and correspondence that are within Defendants' exclusive possession. Plaintiff pleads their existence on the basis of the coordinated conduct that followed, alleged below, which could not have occurred without them.

78. By 2022, SIR was assembling complaints against Plaintiff and back-dating, batching, and stockpiling them. The SIR ultimately issued a consolidated investigative report dated February 5, 2024, covering posts going back to May 10, 2021, an extraordinary delay used to maximize prejudice at arbitration. Upon information and belief, complaints were solicited from managers and held rather than acted upon, so that they could be presented together to create the appearance of a chronic disciplinary history.

79. The delay was due to NYCTA's strategic decision to consolidate and bring disciplinary charges at a time that coincided with Plaintiff's post-assault disability period and with the run-up to the Local 100 election.

80. On August 23, 2022, Plaintiff's birthday, Plaintiff posted a video of homeless men using and occupying a women's locker room on transit property. The post triggered a New York Post story. Although Plaintiff was "re-instructed" about filming on the property, no NYCTA manager was disciplined for the failure of facility security.

**Phase II: Coordinated Intimidation. Richard Davis's Public Threat at the January 2023 Mass-Membership Meeting**

81. In August 2022, Richard Davis met with Plaintiff to discuss his platform for President of the TWU Local 100 and confided in Plaintiff that he was concerned about potential sexual harassment allegations against himself. Not long after Richard Davis shared his concern with Plaintiff, Plaintiff ventured to offer Richard Davis private advice on a different general matter. Plaintiff advised Davis that as a Black man assuming the presidency, Davis would not be afforded the same latitude as prior white presidents and would need to keep other Black members close in his counsel.

82. In or about January 2023, at a TWU Local 100 mass-membership meeting attended by thousands of members, Richard Davis read aloud from one of Plaintiff's private text messages to him. Richard Davis told the audience that "such statements would not be tolerated" and that "action would be taken" against members who made similar remarks. Plaintiff understood and reasonably perceived Richard Davis's statement as a threat directed at him personally.

**The February 21, 2023 Assault at the Bedford Park Break Room**

83. Approximately two to three weeks after Richard Davis's public threat, on February 21, 2023, at approximately 8:20 p.m., Plaintiff was on his authorized break in the platform-level crew room at the Bedford Park subway station in the Bronx. He was speaking on the telephone with his six-year-old son.

84. Gomez, the incumbent Vice President of RTO and a TWU Vice President on Richard Davis's union staff payroll at that time, entered the break room and announced sarcastically, "Here go my best friend." Brian Davis arrived with Gomez. Plaintiff stood up and told Gomez he was tired of his harassment. Gomez kicked Plaintiff in the leg, grabbed him, and punched him in the face.

85. After Plaintiff went to the ground due to the injury to his leg, Gomez mounted Plaintiff and choked him for approximately ten minutes. In a threatening manner, Gomez ordered other employees in the room to leave and stated, "Me and my man gonna do you dirty in here right now." While Plaintiff was pinned and unable to see clearly because Gomez was on top of him, Plaintiff felt repeated impacts to his already-injured leg in the area where Brian Davis was positioned. Gomez was seen on transit surveillance footage walking toward the break room carrying a tool bag and a bulletin board immediately before the assault.

86. Conductor Nieves entered the room and demanded that Gomez get off Plaintiff. Gomez refused. When Plaintiff cried out that his leg was in excruciating pain, Gomez responded, "You just making it up so you can go out on worker's compensation again."

87. Train Service Supervisor Tess Perl then arrived and demanded that Gomez get off Plaintiff; Gomez complied. Plaintiff smelled a strong odor of alcohol on Gomez during the assault.

88. Assistant Chief Transportation Officer Clemente subsequently called and stated that both Plaintiff and Gomez were being taken out of service. Gomez was overheard telling Clemente, "You can't take me out of service."

89. At the time, Plaintiff understood and continues to believe that Gomez wanted to avoid undergoing a drug and alcohol test. Upon information and belief, Davis and the Union intervened to ensure that no such test was administered.

90. Train Service Supervisor C. Sanchez responded to the scene and reported that Gomez was on top of Plaintiff, that Plaintiff could not bear weight on his right leg, and that Plaintiff had blood on his face.

91. Train Operator Zef Alia ("Alia") personally witnessed the assault and told NYCTA and law enforcement after the incident: "I saw the whole thing, and if I say what I saw that guy [Gomez] won't have a job" and "if he [Gomez] comes to me in any way, we're going to have a problem."

92. Plaintiff sustained two fractures in his lower right tibia and fibula and multiple facial fractures. In addition, he sustained back, arm, and head injuries. Plaintiff required four surgical procedures over many months, and he had to learn how to walk again.

93. Plaintiff reported the assault to NYCTA supervisors on the scene and to the NYPD, and he has since described the assault, the participation of Brian Davis, and NYCTA's and the Union's handling of it to the New York State Division of Human Rights, to the New York State Public Employment Relations Board, to state and federal courts, and publicly on his platform. On February 21, 2023, the day of the assault, Plaintiff, the injured party, was arrested on a cross-complaint. The NYPD complaint number is reflected in the arrest paperwork, the cross-complaint, and the related NYPD records.

94. Plaintiff was out of work on disability from February 21, 2023, until his termination. The assault physically prevented Plaintiff from working, from attending union meetings, from campaigning, and, for a period of months, from producing content or communicating with the officials and agencies to whom he regularly reported.

95. Upon information and belief, Richard Davis privately told at least one person that he had orchestrated the assault on Plaintiff because of Plaintiff's activities. That admission establishes that the January 2023 threat and the February 21, 2023 assault were a single course of conduct directed by the Union's President.

**NYCTA Ratifies the Violence: The Victim Is Treated as a Perpetrator and the Enforcers Are Shielded**

96. Although Plaintiff was the one held on the ground and beaten by two other employees, NYCTA and law enforcement treated Plaintiff and Gomez alike by asserting identical misdemeanor assault charges against both employees, which resulted in a "cross-drop."

97. Despite his being the aggressor, neither NYCTA nor law enforcement required Gomez or Brian Davis to be tested for intoxicating substances, nor has Gomez ever served his suspension.

98. Neither NYCTA nor law enforcement separately investigated Brian Davis's role notwithstanding eyewitness reports and surveillance footage. He was never charged.

99. Neither NYCTA nor law enforcement called eyewitness Alia at Plaintiff's subsequent arbitrations.

100. The disciplinary arbitration of Gomez was never placed on the Union Arbitration Calendar. NYCTA failed to inform Plaintiff in advance about the purpose of his being summoned to MTA Headquarters, 2 Broadway, New York, New York 10004, at 4:00 p.m. NYCTA never asked Plaintiff for any of his evidence about Gomez. Plaintiff was not informed why he was being summoned to MTA Headquarters. Gomez's arbitration was conducted on before Arbitrator Pfeffer, with NYCTA represented by Baimusa Kamara and, upon information and belief,an attorney named Lindsay Gossin, and Gomez represented by the Union through Dennis Engel and Chiarello. At no time did anyone from NYCTA or the Union ask Plaintiff to provide any evidence against Gomez.

101. At the time of the assault and its aftermath, Gomez held two positions simultaneously. He was a Vice President of TWU Local 100 on the Union's staff payroll under President Davis, and he remained an NYCTA employee carried on NYCTA's payroll on paid release time. NYCTA retained disciplinary authority over Gomez as its employee, and the Union, through Davis, retained authority over Gomez as its officer and staff member. Neither exercised that authority. NYCTA did not remove Gomez from service, did not test him, and negotiated a thirty-day suspension that, upon information and belief, Gomez has never served. Davis did not suspend Gomez from the Union staff, did not bring internal charges against him under the very Constitution and By-Laws later invoked against Plaintiff, and instead publicly defended him.

102. Plaintiff is informed and believes, and on that basis alleges, that the Gomez disciplinary arbitration was deliberately handled by NYCTA and the Union in a manner designed to minimize Gomez's and Brian Davis's exposure. Plaintiff is informed and believes that management officials and union representatives communicated regarding the handling of Gomez's case and that the procedures employed differed from those utilized in comparable disciplinary matters involving other employees. Plaintiff further alleges that scheduling decisions, notice procedures, witness participation, and the overall handling of the proceeding reflected an effort to achieve a predetermined outcome favorable to Gomez. The full nature and extent of communications concerning the handling of Gomez's arbitration remain within the possession, custody, and control of Defendants and will be the subject of discovery.

103. Upon information and belief, in the weeks after February 21, 2023, NYCTA Labor Relations and the office of the Union President, Defendant Richard Davis, communicated concerning the assault, the disposition of the charges against Gomez, the cross-charge against Plaintiff, and the scheduling of Gomez's arbitration. The resulting disposition, a suspension for the assailant that was never served, no investigation of Brian Davis, and an unpaid suspension and cross-charge for the victim, was the product of those communications.

104. Plaintiff is informed and believes that the lack of information provided during this disciplinary proceeding evidences a coordinated effort by NYCTA management and TWU Local 100 leadership to present the weakest possible case against Gomez and no case at all against Davis.

105. Within a few days after the assault on Plaintiff, Gomez handing out baseball bats to union members.

106. Within a couple of days after the assault on Plaintiff, TWU Local 100 President Richard Davis falsely stated to the Daily News that Plaintiff had instigated the encounter with Gomez and Brian Davis and that Plaintiff had sucker-punched Gomez. Davis made that statement with knowledge that it was false, for the purpose of discrediting Plaintiff's account of the assault before NYCTA, law enforcement, and the membership, and for the purpose of deterring Plaintiff and the eyewitnesses from pursuing it.

107. Davis, who as President controlled the Union's response, did not cause the Union to bring internal charges against Gomez or Brian Davis, did not remove either from the Union staff, and did not cause the Union to seek discipline of Gomez commensurate with the injuries inflicted. By contrast, as alleged below, the Union under Davis's successor has brought and prosecuted three separate sets of internal charges against Plaintiff for speech and association.

108. Furthermore, Plaintiff is informed and believes, and therefore alleges, that two public Facebook groups, Union Truth Squad and Truth Behind the Lies, have been created at the instigation of and/or under the influence of Union leadership and/or by Union staff. These Facebook groups openly attack Plaintiff, seek to discourage Plaintiff's exercise of his free speech, mock and celebrate his injuries from Gomez's assault, and criticize his legitimate efforts to regain his employment at the NYCTA (further allegations as to Plaintiff's termination are below).

**Phase III: The Rigged Tribunal and the Coordinated, Pretextual Termination (2024)**

109. On February 5, 2024, SIR issued a comprehensive report against Plaintiff covering social media activity dating back to May 10, 2021, nearly three years earlier. The report demonstrated NYCTA's surveillance of Plaintiff's constitutionally protected speech, including but not limited to (i) Plaintiff's May 10, 2021 Facebook post about Train Service Supervisor Vickram Soenda; (ii) Plaintiff's January 26, 2022 video about nepotism and money-lending arrangements between Assistant Chief Officers of Transportation; (iii) Plaintiff's February 1, 2022 Twitter posts about unauthorized individuals operating trains in a NYCT train yard; and (iv) Plaintiff's February and March 2022 social media posts concerning a sexual assault of a female employee.

110. Critically, NYCTA did not investigate or charge any of the actual NYCTA managers about whom Plaintiff had raised public interest concerns. Neither was there any investigation of how unauthorized persons had come to operate trains in an NYCT yard.

111. There was no meaningful safety response to the lewd act video that Thompson reposted to alert the public to safety concerns on subway trains.

112. There was no internal accountability for the Assistant Chief Officer regarding the alleged money-lending arrangement. Notwithstanding, MTA Office of the Inspector General had previously investigated allegations of such money-lending arrangements in 2018, the NYCTA's disciplinary apparatus was exclusively trained on Plaintiff as the speaker, not on the conduct brought to light.

113. The termination proceedings were scheduled and expedited against the backdrop of the TWU Local 100 general election. Plaintiff had announced that he would run, off-slate and against the Davis administration, for the office of Vice President of RTO, the office then

held by Gomez. Under the Union's By-Laws and long-standing practice, a member who is not employed by NYCTA faces challenges to his eligibility for office. Plaintiff is informed and believes that NYCTA management and the Davis administration each understood that a termination award issued before the nomination and election period would be used to challenge Plaintiff's eligibility and, at a minimum, would brand the leading dissident candidate as a terminated employee during the campaign.

114. On July 1 and July 18, 2024, an arbitration was conducted before Arbitrator Stephen F. O'Beirne under the parties' collective-bargaining agreement on Disciplinary Action Notification 24-2303-0035. The arbitration was scheduled and conducted while Plaintiff remained on workers' compensation leave, still recovering from surgeries necessitated by the February 21, 2023 assault, notwithstanding Plaintiff's condition and notwithstanding that NYCTA had allowed the underlying charges to accumulate, unprosecuted, for as long as three years.

115. NYCTA was represented by Jerry Granata, Esq.

116. TWU Local 100 was represented by Edward Kennedy, Esq.

117. Acting in deliberate breach of its duty of fair representation and with discriminatory animus against Plaintiff as a political opponent of Richard Davis, and, upon information and belief, at the direction or with the knowledge and acquiescence of Richard Davis, who as President controlled the Union's legal department and its handling of member arbitrations, TWU Local 100 failed to do the following:

118. The Union failed to call the management witnesses Plaintiff identified, including Sticatto and former Chief Officer Tony Abdallah, whose testimony would have established a

pattern of retaliatory targeting by McPhee, Henschke, and Basile, and would have triggered the mandatory dismissal provision of New York Civil Service Law § 75-b(3)(a) for discipline based "solely" on retaliatory motive.

119. The Union failed to properly raise and develop the whistleblower defense under Civil Service Law § 75-b, which requires the arbitrator separately and expressly to consider and determine the retaliation defense "regardless of the employee's guilt or innocence."

120. The Union failed to introduce case authority Plaintiff delivered to union counsel by text message. Such authority included authority establishing that internal employer statements about employee morale, supervision, and managerial conduct are protected concerted activity and protected citizen speech. Plaintiff also provided the Union with authority that would have governed the Soenda matter by establishing that the only "disruption" in the record was the Train Service Supervisor's subjective "alarm" and that this fact alone cannot supply the "objective evidence of disruption" required to defeat protected status.

121. The Union failed to cross examine the unidentified members of NYCTA's so-called "Social Media Review Committee," notwithstanding that the Committee's conclusions formed the gravamen of multiple charges.

122. The Union failed to object to NYCTA's use of an aged, batched, stockpiled disciplinary record (charges spanning 2021–2024) to engineer the appearance of a "bad disciplinary history." This engineered disciplinary history was expressly relied upon by the arbitrator as a basis to refuse mitigation of the termination penalty.

123. Ten days before terminating Plaintiff, on August 9, 2024, O'Beirne issued a separate award (DAN 24-2303-0025) in which he recognized: "Transit employees do not surrender their

First Amendment right to free speech when they become Transit employees. They have the right to discuss matters of public/mutual concern, even if it involves criticism of Transit and/or casts Transit in an unfavorable light." In that companion award, the arbitrator reduced the proposed termination to a fifteen-day suspension.

124. On August 19, 2024, the same arbitrator upheld the NYCTA's termination of Plaintiff. The arbitrator made no separate determination of Plaintiff's whistleblower defense as required by the Court of Appeals in its decision in Matter of Kowaleski v. N.Y.S. Dept. of Corr. Servs., 16 N.Y.3d 85 (2010). O'Beirne made no meaningful First Amendment analysis. The arbitrator did not apply the Pickering balance; he did not identify any actual operational disruption caused by Plaintiff's speech; and he relied principally on subjective offense taken by management as if that were dispositive. The arbitrator's disparate treatment of Plaintiff in the awards in DAN 24-2303-0025 and DAN 24-2303-0035, issued ten days apart by the same arbitrator on indistinguishable speech based conduct, supplies powerful direct evidence of viewpoint discrimination.

125. Plaintiff is informed and believes, and on that basis alleges, that the July 2024 arbitration was not a neutral proceeding whose outcome was in genuine doubt, but a proceeding whose result was arranged among NYCTA's Labor Relations personnel and counsel (Granata), the Union's counsel (Kennedy), and the arbitrator (O'Beirne), and that the participants communicated with one another concerning the scheduling, scope, and outcome of Plaintiff's case outside of Plaintiff's presence and without notice to him. The facts supporting that belief include: (a) NYCTA and the Union jointly selected the arbitrator and jointly control the arbitration calendar under the collective-bargaining agreement; (b) the same arbitrator, ten days earlier, had applied the First Amendment to reduce a proposed

termination to a fifteen-day suspension on indistinguishable speech-based charges, and then, in Plaintiff's case, conducted no First Amendment analysis at all; (c) the arbitrator made no determination of the whistleblower defense that New York Civil Service Law § 75-b(3)(a) required him to make separately, and the Union's counsel did not press him to do so; (d) the Union's counsel declined to call the eyewitness and management witnesses whose testimony would have established retaliatory motive, notwithstanding that Plaintiff identified them and delivered supporting authority; (e) the Union's counsel did not object to NYCTA's use of an aged, batched disciplinary record or to the anonymous "Social Media Review Committee" evidence; (f) the case was expedited while Plaintiff was on medical leave and timed to conclude before the Union election; and (g) the Union thereafter refused Plaintiff's written requests that it seek judicial review of the award.

126. The arbitration mechanism through which NYCTA terminated Plaintiff is a creature of state law. It is the exclusive means by which a tenured public employee's property interest in continued employment may be extinguished for cause, established pursuant to New York Civil Service Law §§ 75 and 76 and the Taylor Law, and the arbitrator's award has the force of a state adjudication, reviewable only through a proceeding under Article 75 of the New York Civil Practice Law and Rules. New York law imposes on the arbitrator a mandatory, non-discretionary duty, when a whistleblower defense is raised, to separately consider and determine that defense and to dismiss the charges if retaliation is the sole basis for the discipline. *See* N.Y. Civ. Serv. Law § 75-b(3)(a); *Matter of Kowaleski v. N.Y.S. Dep't of Corr. Servs.*, 16 N.Y.3d 85 (2010). That statutory entitlement to a whistleblower determination is a property interest created by state law, and its deliberate nullification by

the participants in the proceeding, rather than through any error of judgment, is the deprivation alleged here.

127. The contrast with the disciplinary proceedings of NYCTA employee John Ferretti ("Ferretti") is probative. Ferretti, a non-Black employee, was charged with threatening a manager with physical action in a Facebook post. Ferretti received only a two-day suspension, whereas Plaintiff, a Black union dissident with no comparable threat-of-violence record, was terminated. The Ferretti award was issued on July 30, 2019 by Arbitrator Gary T. Kendellen under the same NYCTA disciplinary system and the same social-media and workplace-conduct rules that NYCTA later invoked against Plaintiff. The disparate treatment is racially patterned and is direct evidence of selective, viewpoint-based enforcement.

128. Plaintiff is informed and believes that Ferretti was not the only employee who engaged in social media activity, criticism of management, controversial public speech, or conduct arguably implicating NYCTA's social media policies but nevertheless received substantially lesser discipline than Plaintiff. Upon information and belief, numerous employees, union activists, management critics, and social media users engaged in conduct comparable to or more serious than that attributed to Plaintiff yet were not terminated from employment. Plaintiff alleges that Defendants selectively enforced workplace policies and disciplinary standards against him while exercising greater leniency toward similarly situated employees who did not share Plaintiff's race, public profile, whistleblowing history, political activities, or criticism of management and union leadership.

129. Plaintiff timely challenged the August 19, 2024 award through a proceeding under CPLR Article 75 in the Supreme Court of the State of New York, Kings County, *Thompson v.*

*New York City Transit Authority*, Index No. 524573/2024, in which he asserted, among other things, that the award was procured through the Union's bad-faith representation and that the arbitrator had failed to make the whistleblower determination required by Civil Service Law § 75-b(3)(a). By decision and order dated June 30, 2025, the Supreme Court denied the petition, and by order dated March 25, 2026, it denied reargument. Plaintiff appealed to the Appellate Division, Second Department, Docket No. 2025-08877, which appeal has been perfected and remains pending. Plaintiff pleads these facts to show that he contemporaneously objected to the arbitration on the grounds alleged here; he does not ask this Court to review the state-court judgment, and the claims asserted here, which arise from Defendants' conduct and not from the judgment, were not and could not have been adjudicated in the Article 75 proceeding.

130. Plaintiff also requested in writing that TWU Local 100 seek judicial review of the award on his behalf, as the Union has done for other members. The Union, then under Richard Davis's administration, refused. Plaintiff filed an improper-practice charge with the New York State Public Employment Relations Board, PERB Case No. U-39638, arising from the Union's handling of his arbitration and its refusal to seek review. The Union's refusal to seek review of an award that it had itself engineered to lose is further evidence that the Union's conduct at the arbitration was deliberate rather than negligent.

131. Plaintiff filed complaints with the New York State Division of Human Rights, Case Nos. 10237181 and 10239572, alleging discrimination and retaliation by NYCTA and/or TWU Local 100. Each of the Defendants named as a respondent in those proceedings had notice of Plaintiff's complaints of discrimination and retaliation no later than the date of service, and the internal union charges and discipline described below followed that notice.

132. Notwithstanding his termination, Plaintiff ran for Vice President of RTO in the Union's December 12, 2024 election and won. Richard Davis resigned as President of TWU Local 100 on or about January 31, 2025, for sexual misconduct and was succeeded by Chiarello without an election. The retaliation against Plaintiff continued without interruption under Chiarello's administration, and, as alleged below, it was accomplished through the same officers, the same counsel, and the same coordination with NYCTA management.

**Phase IV: Prior Restraint, Internal Prosecution, and Removal From Elected Office (2025–2026)**

133. Plaintiff's termination did not end the unlawful retaliation. The retaliatory campaign has continued openly and in writing on official TWU Local 100 letterhead through 2025 and into 2026 under the successor administration of Chiarello, and it has now culminated in Plaintiff's removal from the elected office to which the members chose him.

134. Based upon Plaintiff's information, experience, and belief, Executive Board Member Jesse Argueta brought the first set of charges against Plaintiff on May 20, 2025, regarding Plaintiff's speech at the solicitation and/or the behest of President John Chiarello. In Plaintiff's experience, no charges are brought without direct involvement of the TWU Local 100 president.

135. Argueta's charges against Plaintiff arose from Plaintiff's social media activity, his reporting of FMLA issues to the United States Department of Labor, his communications with HHS concerning the handling of members' medical information at MAC, his interviewing mayoral candidates, his bringing attention to bus operator issues, his bringing attention to police officers sleeping on NYCTA property in crew rooms, and other miscellaneous charges. The charges thus expressly sought to discipline Plaintiff for

providing truthful information to federal agencies. Plaintiff was compelled to defend those charges, with counsel, for more than fifteen months, until the Union exonerated him of every one of them on September 1, 2026.

136. On July 31, 2025, Chiarello, in his capacity as the current President of TWU Local 100, issued a written "cease-and-desist" directive to Plaintiff's counsel demanding that Plaintiff stop producing an independently developed educational "Masterclass" for union members on "navigating and addressing challenges with management." Chiarello's letter threatened that "Dire consequences will follow should he fail to abide by this instruction." Chiarello characterized Plaintiff's independent educational programming, developed entirely with Plaintiff's personal resources and outside any official Local 100 role, as "antithetical to any notion of unionism," as a "conflict of interest," and as having "the potential for triggering Taylor Law violations."

137. On August 14, 2025, TWU Local 100, through its legal counsel, issued a follow-up letter warning that Plaintiff "has been cautioned before about exceeding his authority" and that "violations will result in charge(s) being filed against him." The letter expressly invoked the threat of internal union prosecution as a means of suppressing Plaintiff's independent public interest activity. Plaintiff took this threat seriously since the Union had already shown its willingness to resort to actual physical violence in order to suppress Plaintiff's free speech, retaliate against him for whistleblowing, and silence his political opposition.

138. On September 23, 2025, legal counsel for TWU Local 100 sent a letter to Prudential representative Armando Patino ("Patino") seeking to interfere and discourage Prudential from interviewing Plaintiff as founder of Progressive Action. In an apparent attempt to intimidate and stifle Plaintiff's speech, the letter warned that remuneration could be

reported to the United States Department of Labor and that Progressive Action was a nonprofit required to file appropriate forms with the IRS.

139. On May 21, 2026, Chiarello, again writing on official TWU Local 100 letterhead, issued a third written warning to Plaintiff in connection with a video Plaintiff had posted on or about Sunday, May 17, 2026, that included or arose out of Plaintiff's public interest interview with a candidate for statewide office in New York.

140. In his May 21, 2026 letter, Chiarello directed Plaintiff that "all communications related to the contract must be vetted through the President's Office," told Plaintiff that he is "not an autonomous actor," wrote that "Members and public officials do not differentiate between your personal statements and the position of the Union," and warned that "continued misconduct could lead to further action in accordance with our Constitution and By-Laws."

141. The May 21, 2026 letter is a textbook attempt at unconstitutional prior restraint of protected First Amendment activity. Plaintiff's interview with a candidate for statewide office is core political speech, lying at the heart of what the First Amendment protects. The interview was conducted on Plaintiff's personal time, on his own platform, and addressed matters of unambiguous public concern: transit policy, labor policy, and the conduct of public officials.

142. Chiarello's demand that Plaintiff submit such political speech to "the President's Office" for prior approval is a system of prior restraint that no state actor functioning under color of law (as TWU Local 100 does in this context) may constitutionally impose.

143. Chiarello's assertion that Plaintiff is "not an autonomous actor" and that members and public officials "do not differentiate" between Plaintiff's personal speech and the Union's

position is legally and factually false. Plaintiff has operated Progressive Action since 2015 as his personal platform with public disclosures that distinguish his views from those of the TWU Local 100 administration. Plaintiff identifies himself as a transit worker and dissident, not as a spokesperson for the TWU Local 100 administration; indeed, his entire Progressive Action platform is dedicated to providing an alternative voice. The Union's effort to collapse Plaintiff's identity into the Union's is itself an act of compelled speech in violation of the First Amendment.

144. The May 21, 2026 letter, together with the July 31, 2025 cease-and-desist letter and the August 14, 2025 follow-up, also violates New York Labor Law § 201-d. Plaintiff's public-interest interview with a candidate for statewide office is "political activit[y]" as defined in Section 201-d(1)(a)(ii), constitutes "campaigning for a candidate for public office" within the statute, was performed outside working hours, off employer/union premises, and without use of employer/union equipment. See N.Y. Labor L. § 201-d(2)(a)–(c).

145. The Union's threat of internal charges based on that activity is precisely the conduct Section 201-d was enacted to prohibit.

**Public Safety Whistleblowing: The April 1, 2026 Bus Safety Disclosure and the May 21, 2026 Retaliatory Threat**

146. On April 1, 2026, Plaintiff posted a video on his Progressive Action platform addressing serious bus safety concerns that had been brought to him directly by bus depot inspectors in Staten Island. The concerns disclosed by Plaintiff included, but were not limited to, allegations that buses were being placed into revenue service with mechanical defects, deferred maintenance, brake and steering issues, and other dangerous conditions, thereby

endangering bus operators, transit riders, pedestrians, and other users of the public streets of Staten Island. The video and Plaintiff's related public reporting expressly identified the conditions as a "substantial and specific danger to the public health or safety" of Staten Island within the meaning of New York Labor Law § 740(1)(d) and New York Civil Service Law § 75-b(2)(a)(i).

147. Plaintiff was not the first to raise these concerns publicly, and he was not the most prominent. On February 25, 2026, at the MTA Board meeting, Defendant Chiarello, as President of TWU Local 100, publicly addressed NYCTA and MTA management on the same subject. According to the Union's own published account of that meeting, Chiarello stated that "23 buses" had been "redlined," meaning they should have been held out of service, that management "turned around and put these buses out," that the Union "brought back 23 of them," and that "21 of them had brake defects." He called it "a real issue." He also accused management of ignoring outages in the citywide bus radio system, stated that the outages "have not been addressed with the union," and announced that Local 100 would conduct ongoing inspections "from depot to depot" to ensure that buses were safe for members and the riding public. Chiarello gave news interviews on the same subject. Those statements followed a press conference in late January 2026 at which Local 100 and a coalition of transit unions publicly charged that malfunctioning bus radios had left assaulted members unable to summon help.

148. On March 11, 2026, Chiarello went public a second time. Interviewed by FOX 5 New York outside the Gun Hill Depot, Chiarello stated that the Union was forcing management to stop sending out buses with mechanical problems, including brake defects, and that Local 100 representatives had recently taken 23 buses out of service at Gun Hill Depot that

management had deemed safe for the road. The Union's own March 12, 2026 account of the interview summarized his message in these words: "management is putting service over safety." Defendant Steinberg, identified as the MaBSTOA Maintenance Chair, spoke to the reporter in the same segment and described in graphic terms what happens when the brakes on a city bus fail, saying that a car had no chance against a bus travelling even 20 miles per hour. Chiarello added that bus mechanics were not being hired at the rate needed to keep the fleet safe, in part because of a low starting salary. New York City Transit publicly denied that unsafe buses were being ordered into service. The Union's video of Chiarello's remarks remains posted on the Union's social media, and the FOX 5 report remains available online, to this day.

149. By April 1, 2026, then, the Union's President had twice spoken publicly, once to the MTA Board and once on television, about the very conditions Plaintiff's video addressed: buses with brake and steering defects being placed into revenue service, and management's public denial that it was happening. Defendant Steinberg, the officer who would sign the charges against Plaintiff, had described the danger to a television reporter. Plaintiff's video came three weeks after theirs. The Union charged only Plaintiff. It brought no charge of any kind against Chiarello or Steinberg for "interfering" in the affairs of the Department of Buses, for jeopardizing bus employees, or for embarrassing management, and it held no one but Plaintiff responsible when management retaliated. The only difference between Plaintiff's speech and theirs was that Plaintiff's speech provoked NYCTA management to retaliate against the Union, and, upon information and belief, exposed the existence of unwritten arrangements between management and Union officers concerning the operation of the bus depots and the discipline of bus employees, arrangements that Steinberg

acknowledged at Plaintiff's internal trial. A Union that charges an officer for saying publicly what its own President said publicly twice in the preceding five weeks, and only after management complains, is not enforcing a rule about speech. It is enforcing management's reaction to speech, and it is assigning to Plaintiff the blame for a management reaction that the President's statements had equally invited.

150. Plaintiff's disclosures were made in good faith and were consistent with what the Union's President had publicly reported in the preceding weeks. The information was provided to him by bus depot inspectors in Staten Island with first-hand knowledge of the buses being placed into service and the conditions of those buses. Plaintiff, who does not work with buses and is a member of a different union, sought to disclose a public safety concern on Staten Island to the public, to elected officials, to candidates for statewide office, and through Plaintiff's journalism platform.

151. Following the April 1, 2026 bus safety video, Chiarello, in his capacity as President of TWU Local 100, expressly threatened Plaintiff with internal union charges. Plaintiff was ordered to take down the video, despite the safety hazards it exposed and the threat to public safety. No one asked Chiarello to take down his own remarks on the same subject, which remain online on the Union's social media and on the FOX 5 website.

152. On May 17, 2026, Plaintiff posted a video on his Progressive Action platform that included or arose out of his public interest interview with a candidate for statewide office in New York.

153. On May 21, 2026, Chiarello issued a formal written warning to Plaintiff on official TWU Local 100 letterhead, demanding that Plaintiff submit "all communications related to the

contract" to "the President's Office" for pre-publication review, telling Plaintiff that he is "not an autonomous actor," asserting that "Members and public officials do not differentiate between your personal statements and the position of the Union," and warning that "continued misconduct could lead to further action in accordance with our Constitution and By-Laws." The May 21, 2026 letter is a direct retaliatory threat against Plaintiff for engaging in public safety whistleblowing about MTA buses being placed into service in dangerous condition, for engaging in political speech with a candidate for statewide office, and for refusing to submit his protected speech to the prior approval of union officials.

154. Plaintiff's April 1, 2026 bus safety video, his subsequent reporting on the same subject, and his May 17, 2026 video and underlying interview each constitute disclosure of information concerning a violation of law, rule, or regulation, and/or improper governmental action, that Plaintiff reasonably believed in good faith to be true and that presents a substantial and specific danger to public health or safety within the meaning of New York Civil Service Law § 75-b(2)(a)(i)–(ii) and New York Labor Law § 740(1)(d) and (2)(a). The disclosures concerned the conduct of a state-controlled public-benefit corporation operating commercial motor vehicles on the public streets and the failure of the exclusive collective-bargaining representative to act on those public safety hazards.

155. On April 15, 2026, TWU Local 100 officers Defendants Yates, Rosario, Steinberg, and Ascona brought a second set of charges against Plaintiff (*Yates, et al. v. Thompson*) for his social media posting wherein Plaintiff criticized NYCTA President Demetrius Crichlow ("Crichlow") and solicited information from the Department of Buses about the safety condition of the bus fleet. They alleged that Plaintiff violated the TWU Constitution and

TWU Local 100 By-Laws by posting a video on April 1, 2026, exposing the safety hazards of buses put into public service with safety defects.

156. Upon information and belief, between April 1, 2026 and April 15, 2026, NYCTA managers communicated with Union officers, including Steinberg and Yates, concerning Plaintiff's April 1, 2026 bus-safety video, and conveyed that NYCTA would revoke agreements, reduce overtime, and discipline members unless the Union acted against Plaintiff. Steinberg later testified before the Union's Trial Committee that a manager told him "straight to his face" that Plaintiff's speech was the cause of management's actions against the Union. The Yates charges were filed fourteen days after the video, on NYCTA equipment, during NYCTA-paid time, in direct response to those communications.

157. The Yates charges were prepared and transmitted with NYCTA's resources. Steinberg scanned and transmitted the charging document during working hours, while on paid release time from NYCTA, using an MTA scanner and an employer email address. The Union's Trial Committee acknowledged these facts in its report and dismissed them as "unwise" but immaterial. NYCTA's facilities and paid time were used to prosecute a union dissident for speech that offended NYCTA management. The speech for which Steinberg charged Plaintiff was, in substance, the speech Steinberg had made publicly on FOX 5 on March 11, 2026.

158. On or about May 28, 2026, at a meeting of the Union's Executive Committee, Rosario stated that he had not signed a charging document containing the name of Crichlow and indicated that Crichlow's name had been added to the charges after he signed. Upon information and belief, the charging document was altered after execution to add the allegation that Plaintiff had criticized NYCTA's President, and the altered document was

the one presented to the Executive Board and Trial Committee. The addition confirms that the object of the charges was to punish criticism of NYCTA management.

159. The stated basis of the Yates charges, as later found by the Union's Trial Committee, was that Plaintiff's April 1, 2026 video had caused NYCTA management to "retaliate against the Union." Specifically, NYCTA management "stated that the Union's credibility was shot," revoked its understandings with Union representatives concerning bus repairs and discipline, cut overtime, and imposed discipline on members of the Department of Buses. Yates and Steinberg testified that management had told Steinberg "straight to his face" that Plaintiff's actions had caused NYCTA to renege on its agreements. The Trial Committee credited that testimony and removed Plaintiff from office. The Union thus disciplined Plaintiff because NYCTA management wanted to silence his public safety speech and made the Union pay until it was. The Union acquiesced because its leadership shared management's desire that Plaintiff stop speaking publicly, and, once Plaintiff was no longer an NYCTA employee, the Union was the only instrument through which management could reach him.

160. Yates, Rosario, Steinberg, and Ascona have alleged that Plaintiff jeopardized bus employees by subjecting them to discipline for violation of safety rules and regulations.

161. The charges brought by Yates, Rosario, Steinberg, and Ascona were referred to a Trial Committee. The charges against Plaintiff were initiated, supported, or prosecuted by union officials and/or members including Yates, Rosario, Steinberg, and Ascona. Plaintiff alleges that these officials participated in, supported, ratified, or advanced efforts to investigate, discipline, suppress, or otherwise retaliate against Plaintiff because of his protected speech, political activities, whistleblowing, reporting, and union reform efforts.

162. The decision to proceed with the charges against Plaintiff and to refer them for trial was put to a vote of the Executive Board. That vote was not the independent judgment of the members who cast it. Executive Board member Sherlock Bender told Plaintiff that he had voted to bring the charges against Plaintiff not because he wanted to, but because he had no choice. An Executive Board member who votes to put a fellow officer on trial because he has "no choice" is describing a directed outcome, not a deliberation. Upon information and belief, Chiarello and the charging parties determined before the vote that the charges would proceed, and conveyed to the members of the Executive Board that they were expected to vote accordingly.

163. The July 31, 2025 Chiarello cease-and-desist directive, the August 14, 2025 follow-up letter, the September 23, 2025 letter to Prudential, the April 1, 2026 threat, and the May 21, 2026 letter are each, individually and cumulatively, "retaliatory personnel action" and "retaliatory action" within the meaning of New York Civil Service Law § 75-b(2)(a) and New York Labor Law § 740(1)(e).

164. Each act was taken because of Plaintiff's protected whistleblowing disclosures and was designed to (a) silence Plaintiff's ongoing public-safety reporting, (b) deter other transit workers from bringing public-safety concerns to Plaintiff, and (c) impose a system of prior restraint on Plaintiff's further whistleblowing activity. The retaliatory conduct was contemporaneous with the protected disclosures and is causally linked to them. Defendants' pretextual reliance on internal union "rules" regarding "contract communications" cannot insulate their conduct from Sections 75-b and 740 liability because (i) the "rules" were applied selectively and only to Plaintiff; (ii) the "rules" were not violated by Plaintiff's personal-time, off-premises, independent journalism; and (iii)

the "rules" cannot lawfully be construed to suppress reports of substantial and specific dangers to public health and safety.

**Plaintiff Is Being Subjected to Scrutiny in a Harassing and Discriminatory Fashion Designed to Retaliate for His Speech and to Impede His Non-Union Activities and Protected Speech.**

165. The retaliatory campaign is current, ongoing, and continuing as of the filing of this Complaint. Plaintiff has been removed from office and barred from candidacy; the May 21, 2026 directive requiring that his communications be vetted by the President's Office remains in effect; and the Union has demonstrated that it will impose penalties without regard to its own appellate process or to its representations to this Court.

166. Plaintiff faces an imminent threat of further internal union discipline, including the filing of additional charges and the imposition of penalties up to and including expulsion, that would strip him of his union membership and any remaining political rights within TWU Local 100.

167. Plaintiff also faces an ongoing chill on his protected speech and his ability to inform the public about safety conditions in the largest public transit system in North America. The May 21, 2026 letter expressly directs Plaintiff to cease his protected journalistic and political activity or face further union action.

168. By letter dated May 27, 2026, Bernabel, Secretary-Treasurer of TWU Local 100, demanded in writing, invoking Article XVI(e) of the Local 100 By-Laws, that Plaintiff provide records of collections and expenditures relating to a privately organized bowling event held on April 24, 2026, at which attendees, including but not limited to Local 100 members, paid $25 to bowl. The event bore no Union insignia, made no reference to TWU

Local 100, and was not a Union event. Article XVI(e)(1) applies by its terms to "collections for retirement dinners, charities, benevolent organizations, or to provide assistance to a member or members." It does not apply to a private social event open to the public. When Plaintiff, through counsel, declined to furnish the demanded records, Bernabel filed internal charges (*Bernabel v. Thompson*) on or about June 23, 2026. The demand sought, among other things, the identities of members and non-members who attended and contributed.

169. Other union members and officers have held similar events outside the Union and have not been the subject of such scrutiny. For example, on December 15, 2023, Bernabel attended a networking event called "Cigar Night" that took place in Scarsdale, New York for TWU Local 100 and MTA. Despite an advertised cost of $60.00 per person, the organizer of this event was never required to provide an accounting, and Bernabel was never charged.

**The Federal Action, the August 20, 2026 Hearing, and the September 1, 2026 Removal From Office**

170. Plaintiff commenced this action on June 5, 2026, (ECF No. 1) and filed the First Amended Verified Complaint on July 2, 2026 (ECF No. 7). With the exception of Richard Davis,[1] the Union Defendants waived service, by counsel, on or before July 22, 2026. The NYCTA Defendants waived service on July 28, 2026. Therefore, except Defendant Richard Davis, Defendants knew as early as July 22, 2026, that Plaintiff was a party to, and a witness in, a proceeding before a court of the United States concerning the conduct alleged here.

171. On or about August 14, 2026, Plaintiff moved by order to show cause for a temporary restraining order and preliminary injunction (ECF No. 19) to stay the internal trials on the

[1] Richard Davis waived service on September 17, 2026 (ECF No. 36).

Argueta, Yates, and Bernabel charges, which the Union had scheduled for August 20 and 21, 2026. In opposition, the Union's counsel affirmed under penalty of perjury that if Plaintiff lost at trial, "the Local Union Executive Board will hold a vote about whether to uphold the verdict, and then decide what penalty to impose," that Plaintiff "can then appeal to the International TWU," and that "[n]o penalty is imposed until this process is completed." (ECF No. 23 ¶ 31) Counsel repeated that representation to the Court on the record at the August 20, 2026 hearing: "nothing will happen, nothing will be implemented until the hearing occurs. The hearing committee makes a report, it goes to the executive board and then he has a right to appeal to the international appeals committee. There will be no implementation until that occurs. I made sure that I got it right."

172. On August 20, 2026, relying on the record before it, including that representation, the Court denied the temporary restraining order, and invited Plaintiff to renew his request for a preliminary injunction once the internal proceedings had produced a record. The Union convened the Yates and Bernabel trials at 11:00 a.m. that same day, two hours after the hearing before this Court concluded, and the Argueta trial the following day.

173. The Trial Committee's reports in all three matters are stamped as received by the Union's Recording Secretary on August 26, 2026. On or about August 31, 2026, the Executive Board, presided over by Chiarello and including Defendants Bernabel, Yates, Rosario, Argueta, and Steinberg, voted to adopt the reports. By three letters dated September 1, 2026, the Union notified Plaintiff that (a) in Yates he had been found guilty, "will be removed from Office," and "will be ineligible to hold any elective or appointive position in Local 100 for a period of three years"; (b) in Bernabel the identical penalty was imposed; and (c) in Argueta he had been exonerated. No appeal to the International Union had been

taken or decided. The penalties were imposed immediately and, upon information and belief, have been implemented: Plaintiff's salary has remained but all other benefits as Vice President have been terminated, his access to Union facilities and systems has been cut off, and the Executive Board has moved to fill the RTO Vice Presidency by appointment under Article IX(a) of the By-Laws rather than by election. The injuries Schwartz assured the Court would not happen have happened.

174. The same compulsion governed the Executive Board's adoption of the Trial Committee's reports. After the trials, on August 30, 2026 , persons identifying themselves as being on "the Board" sent text messages from telephone number (347) 335-4889 to individuals associated with Plaintiff, stating that they were members of the Board and that they did not like what was happening to Plaintiff. The senders declined to identify themselves by name. Upon information and belief, they withheld their identities because Executive Board members who are seen to support Plaintiff expect to be treated as Plaintiff has been treated. Plaintiff will identify the subscriber of that number through discovery.

175. Taken together, Bender's statement about the vote to bring the charges and the anonymous messages sent after the trials establish that at both stages of the Union's process, the decision to prosecute and the decision to punish, members of the Executive Board voted as they were directed rather than as they judged. The direction came from Chiarello and the charging parties, and, as the Union's own Trial Committee found, the charging parties were acting on NYCTA management's complaint that Plaintiff's speech had caused management to retaliate against the Union. The votes that removed Plaintiff from office were therefore the product of compelled voting, directed by the Union's leadership in coordination with NYCTA management.

176. The Yates report found that Plaintiff violated TWU Constitution Article XIX(5)(a), (l), and (n) and Local 100 By-Laws Article IV by "interfering" in the affairs of the Department of Buses. The only "interference" identified was Plaintiff's April 1, 2026 video and related public reporting on unsafe buses. The charging parties conceded, and the Trial Committee found, that "it is not the content of the video that made them file the Charges," but rather the consequences the video produced: management's retaliation against the Union. The report acknowledged that a video in which Plaintiff raised identical safety concerns about subway trains drew no charges. The distinction the Union drew, then, was not between protected and unprotected speech, or between speech that did and did not concern Union business, but between speech that provoked NYCTA management and speech that did not.

177. The Bernabel report found that Plaintiff violated By-Laws Article XVI by failing to maintain and produce records of a private event, on the theory that a Union officer who publicly promotes any event at which members pay to attend is "involved in the collection of funds from members." The report acknowledged that By-Laws Article XVI(e)(1) enumerates "retirement dinners, charities, benevolent organizations, or . . . assistance to a member or members," and held that the enumeration is not exclusive. It rejected Plaintiff's evidence that Bernabel himself had attended and promoted paid events, including a December 15, 2023 "Cigar Night" in Scarsdale advertised at $60 per person, without providing any accounting, on the ground that collections for candidates' campaigns are exempt. It also rejected Plaintiff's contention that the demand for the identities of attendees and contributors infringed rights protected by the LMRDA. On that basis it imposed the maximum penalty of removal and a three-year bar.

178. The Argueta report, issued by the same Trial Committee on the same day, dismissed every charge. It found no violation in Plaintiff's videos, in his interviews of bus operators held out of service, in his communications with the United States Department of Health and Human Services, in his reporting of FMLA issues to the United States Department of Labor, or in his alleged involvement in other Departments' affairs, and it noted that the charging party had disclaimed any intent to address free speech. The Committee observed that the charges had been filed only months into Plaintiff's tenure and that Argueta's stated objective, to "correct" Plaintiff's conduct "moving forward," had been met. Plaintiff nonetheless was required to defend those charges for fifteen months.

179. Removal from elected office coupled with a three-year bar on elective or appointive office is the maximum penalty available under the TWU Constitution short of expulsion. Upon information and belief, no elected officer of TWU Local 100 has previously been removed from office and barred from candidacy for a recordkeeping violation, or for public statements about the safety of the transit system. The Union's treatment of others confirms that the penalty was reserved for Plaintiff: (a) Defendant Gomez, a Vice President of the Union when he assaulted Plaintiff and fractured his leg and face, was never internally charged by the Union and, upon information and belief, never served even the thirty-day suspension NYCTA negotiated for him; (b) the organizer of the December 15, 2023 "Cigar Night" event, at which money was collected from members, was never required to provide an accounting and was never charged; and (c) upon information and belief, other Union officers have publicly criticized NYCTA President Demetrius Crichlow and have publicly discussed matters affecting departments other than their own without being charged.

180. Under Article IX(a) of the Local 100 By-Laws, a vacancy in any office other than the Presidency "shall be filled by appointment by the Executive Board." The removal of Plaintiff therefore does not return the RTO Vice Presidency to the members who elected him; it transfers the office to the appointee of the very body that removed him. The three-year bar further ensures that Plaintiff, who has announced his candidacy for higher office in the next general election, cannot appear on the ballot. No post-election remedy can restore to Plaintiff or to the members the office and the election cycle that the September 1, 2026 decisions took from them.

181. The institutional relationship between NYCTA and TWU Local 100 that made the foregoing possible is not arm's-length. Upon information and belief, TWU Local 100's full-time officers and many of its representatives, including Defendants Gomez, Brian Davis, Yates, Rosario, Steinberg, Ascona, and Argueta, are NYCTA employees carried on NYCTA's payroll and released from their NYCTA duties, with pay, to perform union functions, pursuant to the collective-bargaining agreement. NYCTA retains the power to discipline and discharge them as its employees, and NYCTA policies, including the social-media and "Respectful Workplace" directives applied to Plaintiff, apply to them while they perform union functions on NYCTA's time. The Union's officers thus serve at the sufferance of the employer whose management they are supposed to confront, and they have every incentive to police the speech of dissidents whose reporting provokes that employer.

**Defendants' Coordinated Course of Conduct Across NYCTA and TWU Local 100**

182. The allegations in this section are pleaded in support of every remaining cause of action, and in particular the Fourth Cause of Action (joint action) and the Fifth Cause of Action

(conspiracy). They identify the participants in Defendants' coordinated conduct, the role each Defendant played, the acts by which the scheme was carried out, and the injury those acts caused.

183. From at least January 2020 and continuing through the present, Defendants acted as a coordinated group (the "Coordinated Group") consisting of NYCTA officials including Defendants McPhee and Basile, Assistant Chief Transportation Officers Henschke and Lloyd, NYCTA Labor Relations personnel and counsel including Jerry Granata, and the members of NYCTA's Social Media Review Committee; TWU Local 100 officers and staff including Defendants Richard Davis, Chiarello, Gomez, Brian Davis, Yates, Rosario, Steinberg, Ascona, Argueta, and Bernabel, and Union counsel Edward Kennedy; and additional individuals acting in coordination with them, including Does 1–10.

184. The Coordinated Group has a common purpose: to identify, surveil, discredit, injure, and ultimately remove from employment and from union office those transit workers, and Plaintiff in particular, whose public reporting exposes misconduct within NYCTA and TWU Local 100, and thereby to prevent that reporting from reaching the public, elected officials, and state and federal authorities. Its members have ongoing relationships with one another; they, who span the management of the employer and the leadership of the union and who coordinate through the grievance, arbitration, and internal disciplinary machinery they jointly control. The Coordinated Group has longevity sufficient to permit its members to pursue that purpose: it has operated continuously for more than six years, through two Union administrations, and it continues to operate.

185. The members of the Coordinated Group communicated with one another concerning Plaintiff throughout the period alleged. Some of those communications are established by

the Union's own findings and testimony: Steinberg's testimony that an NYCTA manager told him to his face that Plaintiff's reporting was the cause of management's retaliation against the Union, and the Trial Committee's finding that NYCTA revoked agreements, cut overtime, and disciplined members because of Plaintiff's video. Others are established by conduct that could not have occurred without them: the joint scheduling of an off-calendar arbitration for Gomez, the joint scheduling and joint selection of the arbitrator for Plaintiff's termination hearing, and the filing of internal charges against Plaintiff on NYCTA equipment during NYCTA-paid time fourteen days after the video that management wanted stopped. The remaining communications are within Defendants' exclusive possession and will be identified in discovery.

186. The Coordinated Group's activities affect interstate commerce and federally funded programs. NYCTA operates a public transit system funded in part by the federal government that purchases goods, equipment, and services in interstate commerce and operates in connection with interstate transportation networks. TWU Local 100 represents the employees of that system and is itself subject to federal regulation. The Coordinated Group's acts of violence and intimidation, and its interference with Plaintiff's employment and livelihood, were intended to and did affect those activities by suppressing disclosure of unlawful conduct and safety hazards to federal authorities and the public and by chilling participation in union governance.

187. Each Defendant was personally involved in the coordinated conduct alleged in this Complaint and played a part in directing it, as follows:

188. McPhee, as Chief Officer of Subways, ordered that Plaintiff be surveilled and “hung” for anything subordinate managers could find, and presided over the meetings at which Plaintiff was designated a target.

189. Basile, as General Superintendent, transmitted McPhee’s orders to subordinate managers, directed Sticatto to cease contact with Plaintiff, and participated in the targeting meetings.

190. NYCTA, through SIR, the Social Media Review Committee, Labor Relations, and counsel Granata, stockpiled and back-dated charges, conducted the covert Gomez arbitration, scheduled and prosecuted the expedited termination arbitration, and presented the manufactured disciplinary record.

191. Richard Davis, as President of TWU Local 100 from December 2022 through January 2025, directed the Union’s affairs during the period of the assault, the cover-up, and the termination arbitration. He publicly threatened Plaintiff in January 2023; kept Gomez and Brian Davis on the Union staff under his authority; made the false public statement that covered up the assault; declined to bring charges against or discipline the assailants; controlled the Union’s legal department during the July 2024 arbitration, in which the whistleblower defense was withheld; and refused to seek judicial review of the award. Each of these was an exercise of his authority to direct the Union’s response to Plaintiff.

192. Gomez and Brian Davis carried out the physical enforcement of the Coordinated Group’s objectives on February 21, 2023, and Gomez thereafter distributed baseball bats to members. In August 2026, Gomez was present, in the role of “security,” at Plaintiff’s internal trials, a presence that Plaintiff reasonably understood as intimidation and harassment by the man who had broken his leg.

193. Chiarello, as President from February 2025 to the present, issued the July 31, 2025 and May 21, 2026 directives, solicited or approved the internal charges, and presided over the Executive Board that imposed the September 1, 2026 sanctions. Upon information and belief, Chiarello tolerates undisclosed arrangements between management and favored Union officers, including Steinberg, concerning the operation of the bus depots and the dispatch of buses, the terms of which are unknown to the members and the public, and it was the exposure of those arrangements by Plaintiff's reporting, rather than the reporting itself, that Chiarello's administration set out to punish.

194. Argueta filed the May 20, 2025 charges, including charges for Plaintiff's reports to the United States Department of Labor and the United States Department of Health and Human Services, and prosecuted them for fifteen months.

195. Yates, Steinberg, Rosario, and Ascona filed and prosecuted the Yates charges for Plaintiff's April 1, 2026 bus-safety reporting, using NYCTA equipment, email, and paid time, and, upon information and belief, altered the charging document to add Plaintiff's criticism of NYCTA's President. Yates and Steinberg testified at trial that the charges were brought because of management's retaliation against the Union. Stated differently, the charges were brought on management's behalf: once NYCTA had terminated Plaintiff, management could reach him only through the Union, and the Union's officers supplied the reach.

196. Bernabel demanded the identities of attendees and contributors at Plaintiff's private event, filed and prosecuted the Bernabel charges when Plaintiff declined, and, as a member of the Executive Board, voted on the sanctions.

197. TWU Local 100, through its officers, counsel, Trial Committee, and Executive Board, adjudicated the charges and imposed and implemented the sanctions. Members of the Executive Board were directed how to vote at both stages: Executive Board member Sherlock Bender told Plaintiff that he had voted to bring the charges not because he wanted to but because he had no choice, and after the trials other members, identifying themselves only as being on "the Board," anonymously conveyed to Plaintiff's associates from telephone number (347) 335-4889 that they did not like what was happening to Plaintiff.

198. Defendants' coordinated acts of intimidation, obstruction, and retaliation against Plaintiff, each committed by two or more Defendants acting in concert and spanning a period of more than three years and continuing, include the following.

199. The first coordinated act is the January 2023 threat. In or about January 2023, at a mass-membership meeting attended by thousands, Davis read aloud from Plaintiff's private text message and announced that "such statements would not be tolerated" and that "action would be taken" against members who made similar remarks. Davis made that threat with the intent to intimidate Plaintiff and to hinder, delay, and prevent Plaintiff's continued communications, to law-enforcement officers of the United States and to others reasonably likely to relay them, of information relating to the commission or possible commission of federal offenses, including the money-lending and nepotism arrangements Plaintiff had reported in January 2022 and the handling of the sexual assault Plaintiff had reported in early 2022.

200. The second coordinated act is the February 21, 2023 assault. On February 21, 2023, at approximately 8:20 p.m., in the crew room at the Bedford Park station, Gomez and Brian Davis used physical force against Plaintiff, fracturing his tibia, fibula, and facial bones,

choking him, and ordering witnesses from the room while announcing that they would "do [him] dirty." Gomez and Brian Davis, aided and abetted by Richard Davis, used that force with the intent to hinder, delay, and prevent Plaintiff's communications to federal law-enforcement officers and agencies of information relating to the commission or possible commission of federal offenses, and, to the extent Plaintiff had already provided such information in his internal complaints to the OIG before that date, with the intent to retaliate against him for having done so. Gomez's taunt that Plaintiff was "making it up so you can go out on worker's compensation again" and Richard Davis's false public statement two days later that Plaintiff had instigated the encounter show that the assailants and the Union's President understood the assault as reprisal for Plaintiff's prior reports and complaints and intended the assault to deter further ones. Gomez's distribution of baseball bats to union members in the days that followed was a further act of intimidation directed at Plaintiff and at any member who might corroborate his account.

201. The third coordinated act is the Cover-Up and the Cross-Charge. In the days and months following the assault, Richard Davis publicly and falsely accused Plaintiff of instigating it; NYCTA suspended Plaintiff without pay and cross-charged him with the same misdemeanor as his attacker; NYCTA and the Union declined to test, remove, or investigate the assailants; and NYCTA and the Union conducted Gomez's arbitration off the calendar, without notice to Plaintiff and without his evidence. These acts were undertaken with the intent to intimidate and corruptly persuade Plaintiff and the eyewitnesses, including Alia, to withhold or alter their accounts of the assault, and to hinder, delay, and prevent their communications to federal authorities of information

relating to the assault and its cover-up, which themselves constituted possible federal offenses under 18 U.S.C. §§ 241, 242, and 1512.

202. The fourth coordinated act is Plaintiff'she Termination. Between February 5, 2024 and August 19, 2024, NYCTA, McPhee, Basile, Davis, and the Union, acting through Granata, Kennedy, and O'Beirne, prosecuted and procured the termination of Plaintiff's employment on stockpiled, three-year-old charges arising entirely from his public reporting, while withholding the whistleblower defense that state law required to be determined. The termination was an act harmful to Plaintiff, including interference with his lawful employment and livelihood, undertaken with the intent to intimidate and corruptly persuade Plaintiff to cease his reporting and to hinder, delay, and prevent his communications to federal authorities of information relating to the commission or possible commission of federal offenses, and, to the extent Plaintiff had by then provided truthful information to federal law-enforcement officers, in retaliation for his having done so.

203. The fifth coordinated act is the Argueta Charges. On May 20, 2025, Argueta, at the solicitation or with the approval of Chiarello, filed internal charges against Plaintiff that expressly charged him with reporting FMLA issues to the United States Department of Labor and with communicating with the United States Department of Health and Human Services concerning the handling of members' medical information, which communications provided truthful information to federal officers relating to the possible commission of federal offenses, including violations of 42 U.S.C. § 1320d-6. The Union prosecuted those charges for fifteen months, requiring Plaintiff to retain counsel and defend himself at trial. The filing and prosecution of the charges were actions harmful to Plaintiff,

including interference with his lawful employment as a Union officer, taken with the intent to retaliate against him for providing that information.

204. The sixth coordinated act is the Prior-Restraint Directives. On July 31, 2025, August 14, 2025, September 23, 2025, and May 21, 2026, Chiarello and the Union, through counsel, issued written directives and threats of internal discipline requiring Plaintiff to cease independent programming and to submit his communications to the President's Office for vetting, and warning that "[d]ire consequences will follow" and that charges would be filed. These directives were undertaken with the intent to intimidate and corruptly persuade Plaintiff to cease, and to hinder, delay, and prevent, his communications to elected officials, candidates for statewide office, and state and federal authorities concerning unsafe buses in revenue service and other matters relating to the possible commission of federal offenses.

205. The seventh coordinated act is the Yates and Bernabel Charges and the September 1, 2026 Removal. In April and May 2026, Yates, Steinberg, Rosario, Ascona, and Bernabel filed internal charges against Plaintiff; on August 20, 2026, the Union tried them; and on September 1, 2026, Chiarello, Bernabel, and the Executive Board removed Plaintiff from his compensated elected office and barred him from office for three years. These acts interfered with Plaintiff's lawful employment and livelihood as an officer of the Union and were taken (a) in retaliation for Plaintiff's April 1, 2026 public-safety reporting and for the truthful information he had provided to federal officers and agencies concerning the matters alleged above; and (b) upon information and belief, after Plaintiff commenced this action on [June , 2026], with the further intent to intimidate Plaintiff and to influence, delay, or prevent his testimony and participation as a party and witness in this proceeding before

a court of the United States, and to dissuade him from prosecuting it. The Union imposed the penalty twelve days after its counsel represented to this Court that no penalty would issue until Plaintiff's internal appeal was complete.

206. Each of the foregoing acts was committed knowingly and with the requisite intent. Each was committed by two or more Defendants acting in concert. Plaintiff pleads the acts with the particularity available to him; the internal communications by which they were planned and coordinated are within Defendants' exclusive possession, and Plaintiff will supplement these allegations upon discovery.

207. The coordinated acts are related to one another. They have the same participants (NYCTA management and Union officers spanning two administrations), the same victim (Plaintiff), the same purpose (to silence Plaintiff's reporting and to prevent it from reaching the public and federal authorities), and the same methods (threats, force, manufactured discipline, and rigged adjudication). Retaliation against a whistleblower is, moreover, inherently related to the underlying wrongdoing the whistleblower exposed. It can serve as the final act of the scheme to keep that wrongdoing concealed. *See DeGuelle v. Camilli*, 664 F.3d 192, 200–204 (7th Cir. 2011).

208. The coordinated acts form a continuing course of conduct: they span more than three and one-half years, from January 2023 through September 2026, and, measured from the commencement of the surveillance program, more than six years. The two-track disciplinary system through which they were carried out is the Coordinated Group's regular way of doing business, has been applied to other whistleblowers and dissidents, including Sticatto, and remains in operation; the May 21, 2026 directive remains in force; the three-year bar extends the sanction into 2029; and Defendants have shown that they will impose

further penalties without regard to internal process or to representations made to this Court. The threat of continued retaliation is therefore actual and specific.

209. Plaintiff suffered concrete economic injury by reason of the coordinated acts. Coordinated Acts 2 through 4 proximately caused the loss of his employment as an NYCTA Conductor effective August 19, 2024, together with the wages, pension, and benefits attendant to it. Coordinated Acts 5 through 7 proximately caused the loss of his compensated elected office as Vice President of RTO effective September 1, 2026, together with its salary and benefits and his eligibility for elective and appointive office through 2029, and required him to incur legal fees and expenses in defending the internal charges. These injuries are direct, concrete, and quantifiable, and they flow directly from the coordinated acts rather than from any intervening cause. Plaintiff also seeks damages for personal injury, pain and suffering, and emotional distress under the Counts below.

210. Each Defendant knowingly agreed to participate in the coordinated scheme alleged above, and knowingly agreed that acts in furtherance of it would be committed by a member of the group, as follows: McPhee and Basile agreed in 2020 to surveil Plaintiff and to build a disciplinary case against him for his reporting, and agreed that NYCTA would prosecute that case to termination; Davis agreed, no later than January 2023, that the Union would tolerate and cover for violence against Plaintiff by its staff and would not defend Plaintiff in earnest at arbitration; Gomez and Brian Davis agreed to carry out the assault; NYCTA, through Labor Relations and Granata, agreed with the Union, through Kennedy and Davis, to conduct the Gomez arbitration off the calendar and to procure Plaintiff's termination through an arbitration in which the whistleblower defense would not be determined; Chiarello agreed, no later than July 2025, to continue the campaign through directives and

internal charges; Argueta, Yates, Steinberg, Rosario, Ascona, and Bernabel each agreed to file and prosecute charges against Plaintiff for his public reporting and his federal communications, knowing that removal from office was the intended result; and Chiarello, Bernabel, and the Executive Board agreed to impose that result on September 1, 2026, notwithstanding the pending appeal and the Union's representations to this Court. Each Defendant took the overt acts attributed to him or it above in furtherance of that agreement.

211. Plaintiff was injured in the manner alleged above by reason of that agreement and the acts taken in furtherance of it. The internal communications by which the coordinated acts were planned are within Defendants' exclusive possession, and Plaintiff will supplement these allegations upon discovery.

**Plaintiff Was Terminated, Threatened, and Removed From Office as a Direct Result of His Speech and Whistleblowing.**

212. But for Plaintiff's protected speech, NYCTA would not have surveilled him; the so-called Social Media Review Committee would not have been formed against him; the SIR investigations would not have been opened; the disciplinary charges would not have been brought; and the August 19, 2024 termination award would not have issued.

213. But for Plaintiff's status as a union political opponent of Davis and Chiarello, the Union would not have orchestrated a perfunctory arbitration designed to lose, would not have suppressed the *Kowaleski* defense, would not have refused to call eyewitnesses, would not have refused to seek judicial review of the award, would not have issued the July 31, 2025 and May 21, 2026 cease-and-desist and prior-restraint letters, would not have prosecuted three sets of internal charges against him, and would not have removed him from elected office and barred him from candidacy for three years.

214. But for the coordinated effort between NYCTA management (the McPhee-Basile-Henschke axis) and TWU Local 100 leadership (the Davis-Chiarello axis), Plaintiff would still be employed, would still hold his elected office, would still be exercising his rights as a citizen without threat, and would not face the ongoing prior restraint on his political speech alleged herein. It is shown by specific acts at specific times and places: the joint handling of the uncalendared Gomez arbitration at 2 Broadway; NYCTA's decision to suspend the victim and shield the aggressors, both of whom were on its payroll and the Union's staff; the joint selection of the arbitrator and the joint scheduling of Plaintiff's termination hearing on July 1 and 18, 2024, while he was on medical leave and before the Union election; Union counsel's deliberate omission of the statutorily mandatory whistleblower defense in NYCTA's presence; the Union's refusal to seek review of the resulting award; Steinberg's use of NYCTA equipment, email, and paid release time to file the Yates charges; the alteration of those charges to add Plaintiff's criticism of NYCTA's President; the Trial Committee's express finding that the charges were prosecuted because NYCTA management had "retaliated against the Union" for Plaintiff's speech; and the Executive Board's removal of Plaintiff on that basis. Plaintiff is further informed and believes that NYCTA management personnel and officials within TWU Local 100 communicated directly regarding Plaintiff's April 1, 2026 video and the Union's response to it, and that those communications, which are within Defendants' exclusive possession, will be established through discovery.

## CAUSES OF ACTION

## FIRST CAUSE OF ACTION

### First Amendment Retaliation, 42 U.S.C. § 1983

### (Against NYCTA, McPhee, Basile, and Does 1–10 in their individual capacities)

215. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

216. At all relevant times, Plaintiff engaged in speech as a private citizen, on his own time, off NYCTA premises, on his own equipment, addressed to matters of public concern, and outside the scope of his official duties as a Conductor. His speech is protected by the First Amendment as construed in Pickering, Connick, Garcetti, and Lane.

217. Defendants NYCTA, McPhee, Basile, and John Does 1–10 are persons acting under color of state law within the meaning of 42 U.S.C. § 1983.

218. Defendants took adverse employment actions against Plaintiff that would chill a person of ordinary firmness from continuing to engage in protected speech, including but not limited to: covert surveillance, formation of a secret "Social Media Review Committee," consolidation of stockpiled charges, tolerance of overt violence in the workplace, manufactured "re-instruction," forced disciplinary hearings during active workers' compensation leave, expedited disciplinary scheduling timed to the union election, and ultimately the termination of his employment on August 19, 2024.

219. Plaintiff's protected speech was a substantial and motivating factor for the adverse actions. NYCTA cannot satisfy its Pickering burden of demonstrating, by a preponderance of the evidence, that the same actions would have been taken absent the protected speech, because (a) NYCTA cannot identify any actual operational disruption attributable to the speech as

opposed to managerial offense; (b) the only "disruption" in the record (Soenda's purported "alarm") was the listener's own subjective overreaction; and (c) the arbitrator's own August 9, 2024 award in DAN 24-2303-0025 confirms that the same body of conduct, when not viewed through a viewpoint-discriminatory lens, did not warrant termination.

220. Defendants McPhee and Basile acted with personal involvement, were the moving force behind NYCTA's unconstitutional acts, and acted with actual knowledge that their surveillance-and-target program was directed at the suppression of Plaintiff's protected speech and dissent. Plaintiff alleges that Defendants' actions were directed not merely at Plaintiff personally, but at discouraging future criticism, whistleblowing, reform advocacy, and public scrutiny by other transit workers. Defendants McPhee and Basile are not entitled to qualified immunity because the right of public employees to be free from retaliation for citizen speech on matters of public concern was clearly established at all relevant times.

221. NYCTA is liable under Monell because (a) the suppression of Plaintiff's speech was carried out pursuant to a policy, custom, or practice of viewpoint-discriminatory discipline for employee social-media speech; (b) NYCTA's "All Agency Social Media Usage Policy Directive 11-072" and "Respectful Workplace" directives, as applied, operate as an unconstitutional prior restraint and viewpoint-discriminatory rule; and (c) McPhee, as the highest-ranking operational officer in Plaintiff's chain of command, was a final policymaker whose conduct subjects NYCTA to municipal liability.

222. Plaintiff is informed and believes that the actions taken against him were not isolated events but were undertaken pursuant to policies, customs, practices, or longstanding patterns of conduct within NYCTA relating to employee speech, social media activity,

whistleblowing, and criticism of management. Plaintiff alleges that NYCTA maintained and enforced policies concerning employee social media activity in a manner that disproportionately targeted employees whose speech criticized management, exposed safety concerns, raised allegations of misconduct, or otherwise challenged institutional interests. Plaintiff further alleges that other employees were subjected to monitoring, investigation, discipline, or adverse treatment based upon their protected speech and public commentary. Upon information and belief, the actions directed toward Plaintiff reflected broader institutional practices involving the monitoring and regulation of employee speech rather than a single isolated personnel decision.

223. As a direct and proximate result of these unlawful acts, Plaintiff has suffered loss of livelihood, back pay, front pay, pension, fringe benefits, severe emotional distress, reputational injury, and damage to his First Amendment freedoms, for which he is entitled to compensatory damages, punitive damages, equitable reinstatement, declaratory relief, attorneys' fees under 42 U.S.C. § 1988, and costs.

## SECOND CAUSE OF ACTION

### Fourteenth Amendment Equal Protection, 42 U.S.C. § 1983

### (Against NYCTA, McPhee, Basile, and Does 1–10)

224. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

225. Plaintiff is a Black man. He was singled out, surveilled, assaulted, disciplined, and terminated for speech-related conduct that white and non-Black NYCTA employees were not so disciplined for. The non-Black comparator, John Ferretti, received a two-day suspension for a Facebook "smackdown" post that contained an actual threat of physical

action against a manager. Plaintiff received termination for posts that did not threaten violence. The animus with which Plaintiff was singled out is reflected in supervisors' use, from as early as 2018, of the derogatory code word "red meat" to refer to him.

226. Plaintiff brings this claim in the alternative as a class-of-one equal protection claim under Village of Willowbrook v. Olech, 528 U.S. 562 (2000), to the extent that doctrine is not displaced by the First Amendment claim above, because no rational basis distinguishes the discipline imposed on Plaintiff from the discipline imposed on similarly situated comparators including Ferretti.

227. Defendants treated Plaintiff differently from similarly situated employees with no rational basis other than discriminatory animus and retaliation for his political and social-justice viewpoint, causing him cognizable injury.

**THIRD CAUSE OF ACTION**

**Fourteenth Amendment Procedural Due Process, 42 U.S.C. § 1983**

**(Against NYCTA, McPhee, Basile, TWU Local 100, Richard Davis, and Does 1–10)**

228. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

229. As a tenured public employee, Plaintiff possessed a property interest in his continued employment under New York law, including New York Civil Service Law §§ 75 and 76 and the just-cause and disciplinary provisions of the collective-bargaining agreement, of which he could not be deprived without due process of law.

230. Plaintiff also possessed a second, distinct property interest created by state law: the statutory entitlement, under New York Civil Service Law § 75-b(3)(a), to have any

whistleblower retaliation defense he raised in a disciplinary arbitration "separately consider[ed] and determine[d]" by the arbitrator, and to have the charges dismissed if retaliation was the sole basis for them, "regardless of the employee's guilt or innocence." A state-created cause of action or mandatory adjudicative entitlement is a species of property protected by the Due Process Clause. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 428–33 (1982).

231. The arbitration mechanism that purported to terminate Plaintiff was state action. It is the exclusive procedure prescribed by state law and the state-sanctioned collective-bargaining agreement for extinguishing a tenured public employee's property interest; the arbitrator acts as the State's adjudicator; and the resulting award has the force of a state judgment.

232. That mechanism was constitutionally infirm as applied to Plaintiffbecause the participants in the proceeding, acting pursuant to the established procedure and with authority over it, deliberately declined to follow the mandatory procedures that state law prescribes to protect the property interest at stake. Specifically: (a) the Union, charged by statute with being Plaintiff's exclusive representative, acted in bad faith and with discriminatory animus, depriving Plaintiff of any meaningful representation and deliberately withholding the *Kowaleski* defense; (b) NYCTA and the Union together produced an opaque "Social Media Review Committee" record that Plaintiff was prevented from confronting; (c) the arbitrator refused to make the separate Kowaleski determination required as a matter of New York law, in a proceeding in which the whistleblower facts were placed before him; (d) Plaintiff was forced into expedited discipline while on active workers' compensation leave, depriving him of a reasonable opportunity to mount a defense; and (e) NYCTA

presented, and the arbitrator relied upon, a disciplinary history that NYCTA had deliberately manufactured by stockpiling and back-dating charges.

233. In *Logan*, the Supreme Court held that when the State's adjudicative machinery destroys a protected entitlement by failing to follow the mandatory procedures the State has prescribed, the deprivation occurs "by operation of law" and violates due process, and that the availability of post-deprivation state remedies does not cure the violation because the deprivation is effected by established state procedure rather than by random, unauthorized conduct. *See* 455 U.S. at 435–37. The same is true here. The whistleblower determination that § 75-b(3)(a) mandates was not overlooked; it was suppressed by the Union, unopposed by NYCTA, and omitted by the arbitrator. The property interest that the statute created was thereby extinguished without any process at all.

234. Because the August 19, 2024 award was procured through the deliberate subversion of the mandatory procedures that governed the proceeding, it is void, and Plaintiff is entitled to a declaration to that effect, to vacatur of the award, and to equitable reinstatement with back pay.

235. Defendants McPhee and Basile personally caused the deprivation by directing the surveillance and stockpiling of charges that produced the manufactured disciplinary record on which the arbitrator relied. Defendant Davis personally caused the deprivation by directing or acquiescing in the Union's deliberate withholding of the Kowaleski defense and its refusal to seek review of the award. NYCTA is liable under Monell because the deprivation was carried out through its established disciplinary procedure and by its final policymaker. TWU Local 100 is liable as a willful participant in joint action with the State, as alleged in the Fourth and Fifth Causes of Action.

236. As a result, Plaintiff was deprived of two constitutionally protected property interests, his continued employment and his statutory entitlement to a whistleblower determination, without the process due.

## FOURTH CAUSE OF ACTION

### First and Fourteenth Amendment Retaliation, 42 U.S.C. § 1983 (Joint Action)

### (Against TWU Local 100, Richard Davis, John V. Chiarello, Canella Gomez, Brian Davis, Donald Yates, Scott Steinberg, Gary Rosario, Daniel Ascona, and Carlos Bernabel)

237. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

238. A private party acts under color of state law for purposes of 42 U.S.C. § 1983 when the deprivation is caused by the exercise of a right or privilege created by the State and the private party is "a willful participant in joint action with the State or its agents." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937, 941 (1982); *Dennis v. Sparks*, 449 U.S. 24, 27–28 (1980). Both elements are satisfied here.

239. TWU Local 100 is a state actor because it was a willful participant with NYCTA and its officials in the specific retaliatory deprivations alleged here. NYCTA and TWU Local 100 coordinated their conduct, communicated with one another concerning Plaintiff, and used their respective authority over Plaintiff's employment and his elected union office to punish Plaintiff for the same protected speech. A private party that willfully participates in joint activity with the State or its agents acts under color of state law and is liable under § 1983 for the deprivation, and the conspiracy of a private party with public officials is state action as to every participant. *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970); *United States v. Price*, 383 U.S. 787, 794 (1966); *Hughes v. Patrolmen's Benevolent Ass'n*

*of the City of New York, Inc.*, 850 F.2d 876, 880–81 (2d Cir. 1988) (police union and its president liable under § 1983 where they conspired with the plaintiff's commanding officers to cause the loss of his position and, with the Department's knowledge and consent, placed him under surveillance).

240. Every instrument the Union Defendants used against Plaintiff derives from state law. The Union's status as exclusive bargaining representative, its control over the grievance and arbitration process by which Plaintiff was terminated, its officers' paid release time from NYCTA, and the Taylor Law disciplinary mechanism through which Plaintiff's property interest was extinguished are all rights and privileges conferred by the State of New York. The Union did not act as a private association enforcing private rules; it acted as the State's designated agent in the State's own disciplinary process, and then used the consequences of that process, and its officers' NYCTA-paid time and equipment, to complete the retaliation internally.

241. The Union Defendants were willful participants in joint action with NYCTA and its officials, as shown by the following specific acts, each identified by time, place, and participants:

242. On February 21, 2023, at the Bedford Park crew room, Defendants Gomez and Brian Davis, both NYCTA employees on paid release time and both members of the Union staff under Defendant Davis, assaulted Plaintiff. NYCTA, through Assistant Chief Transportation Officer Clemente and Labor Relations, immediately ratified the assault by suspending the victim without pay, cross-charging him with the same misdemeanor as his attacker, declining to test Gomez despite reports that he was intoxicated, declining to investigate Brian Davis at all, and negotiating a thirty-day suspension for Gomez that he

has never served. The Union, through Davis, reciprocated by publicly blaming Plaintiff, bringing no internal charges against Gomez or Brian Davis, and leaving both on its staff.

243. In 2023, at MTA Headquarters, 2 Broadway, NYCTA Labor Relations and the Union jointly conducted Gomez's disciplinary arbitration off the Union Arbitration Calendar, without notice to Plaintiff of its purpose, without soliciting his evidence, and without calling the eyewitnesses. The proceeding required the cooperation of both institutions and was structured by both to produce the minimum discipline.

244. On July 1 and July 18, 2024, before Arbitrator O'Beirne, NYCTA counsel Granata and Union counsel Kennedy jointly conducted a termination arbitration that NYCTA scheduled while Plaintiff was on medical leave and that both timed to conclude before the Union election. In NYCTA's presence and without objection from it, the Union withheld the mandatory § 75-b whistleblower defense, declined to call the eyewitness and management witnesses Plaintiff identified, declined to introduce the authority Plaintiff hand-delivered, and declined to challenge the anonymous "Social Media Review Committee" evidence or the stockpiled disciplinary record. The arbitrator, whom NYCTA and the Union jointly selected, then omitted the whistleblower determination that state law required. Afterward, the Union, under Davis, refused Plaintiff's written requests to seek judicial review.

245. In or about April 2026, Defendant Steinberg, while on paid release time from NYCTA, used an MTA scanner and an employer email address to prepare and transmit the Yates charges against Plaintiff for his April 1, 2026 bus-safety video. Upon information and belief, the charging document was thereafter altered to add an allegation that Plaintiff had criticized NYCTA's President. NYCTA's resources were thus used to prosecute Plaintiff for speech that NYCTA management wanted stopped.

246. On August 20 and 21, 2026, the Union tried the charges, and on August 31 and September 1, 2026, the Executive Board removed Plaintiff from office and barred him from candidacy for three years. The Union's own Trial Committee found, and the Executive Board adopted the finding, that the charges were prosecuted because NYCTA management had "retaliated against the Union" for Plaintiff's speech, revoked its agreements, cut overtime, and disciplined members, and because a manager had told Steinberg "straight to his face" that Plaintiff's speech was the cause. The Union removed Plaintiff to satisfy NYCTA management. That is joint action by the Union's own admission. The Executive Board members who voted to send the charges to trial and then to remove Plaintiff did not do so as a body exercising independent judgment: one has said he voted to bring the charges because he had no choice, and after the trials others said anonymously that they opposed what was being done. The decisions were Chiarello's and the charging parties', made to satisfy management, and ratified at each stage by a Board that had been told how to vote.

247. Upon information and belief, Defendants McPhee, Basile, Chiarello, and other NYCTA and TWU Local 100 officials engaged in ongoing communications concerning Plaintiff, his Progressive Action activities, his public criticisms of management and union leadership, and his role in union politics, including communications in 2020 concerning the surveillance of Plaintiff, communications in February and March 2023 concerning the assault and the disposition of the Gomez and Thompson charges, communications in 2024 concerning the scheduling and conduct of the termination arbitration, and communications in April and May 2026 concerning the Union's response to Plaintiff's bus-safety video, the last of which the Union's own Trial Committee confirmed. Those communications are within Defendants' exclusive possession.

248. The Union Defendants acted with the specific intent to retaliate against Plaintiff for his First Amendment protected speech and association with the Progressive Action dissident slate, and Chiarello continues to enforce an unconstitutional prior restraint and to threaten internal discipline directed at suppressing Plaintiff's political and public-interest speech. The Union's discriminatory, bad-faith, and arbitrary handling of Plaintiff's underlying arbitration, including its deliberate omission of the Kowaleski whistleblower defense, its refusal to call eyewitness Alia and management witnesses Sticatto, Abdallah, and Henschke, its failure to introduce case authority Plaintiff personally delivered to Union counsel, and its refusal to bring internal charges against its own officers Gomez and Brian Davis for the assault, is direct evidence of the Union's coordinated participation with NYCTA management in the targeted suppression of Plaintiff's protected speech.

249. Defendant Richard Davis is liable individually because he personally made the January 2023 threat that preceded the assault by his staff, personally made the false public statement that covered it up, personally controlled whether the Union would charge Gomez and Brian Davis, personally controlled the Union's legal department during the July 2024 arbitration, and personally controlled whether the Union would seek judicial review of the award. Defendants Gomez and Brian Davis are liable individually for the assault, committed on NYCTA property and NYCTA time by NYCTA employees, and ratified by NYCTA. Defendants Chiarello, Yates, Steinberg, Rosario, Ascona, and Bernabel are liable individually for initiating, prosecuting, and adopting the internal charges and sanctions imposed to satisfy NYCTA management.

250. In so doing, the Union Defendants, acting jointly with NYCTA, also treated Plaintiff differently than other similarly situated members and officers based upon his race and his viewpoint and without any rational basis, in violation of the Equal Protection Clause.

251. As a direct and proximate result, Plaintiff has suffered the loss of his employment, the loss of his elected office and its compensation, physical injury, emotional distress, reputational harm, and the chilling of his protected speech, for which he is entitled to compensatory damages, punitive damages against the individual Defendants, injunctive relief, and attorneys' fees under 42 U.S.C. § 1988.

## FIFTH CAUSE OF ACTION

### Conspiracy to Deprive Plaintiff of First and Fourteenth Amendment Rights, 42 U.S.C. § 1983

### (Against NYCTA, McPhee, Basile, TWU Local 100, Richard Davis, John V. Chiarello, and Does 1–10)

252. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein. Plaintiff specifically incorporates the allegations concerning Defendants' Coordinated Course of Conduct, including Coordinated Acts 1 through 7 and the agreement alleged there, as the overt acts and agreement supporting this Count.

253. Defendants NYCTA, McPhee, Basile, TWU Local 100, Davis, Chiarello, and Does 1–10 entered into an agreement among themselves, and with non-party Arbitrator Stephen F. O'Beirne and the members of the TWU Local 100 Trial Committee, to act in concert to inflict an unconstitutional injury on Plaintiff: the termination of his employment, and later the removal from his elected office, in retaliation for his protected speech and without the process due, through adjudicative proceedings whose outcomes were arranged in advance.

254. Overt acts in furtherance of the conspiracy include: (a) NYCTA's and the Union's joint scheduling of Plaintiff's termination hearing for July 1 and 18, 2024, while Plaintiff was on medical leave, and their joint selection of O'Beirne; (b) Union counsel's deliberate omission of the § 75-b whistleblower defense and the exculpatory witnesses, in NYCTA's presence and without objection; (c) NYCTA counsel's presentation of the anonymous Social Media Review Committee findings and the stockpiled disciplinary record, and the Union's failure to object; (d) O'Beirne's issuance, on August 19, 2024, of an award that made no whistleblower determination and conducted no First Amendment analysis, ten days after he had conducted that analysis and reduced a termination to a fifteen-day suspension on indistinguishable charges; (e) the Union's refusal, under Davis, to seek judicial review of the award; (f) the Union's prosecution of the Yates and Bernabel charges before a Trial Committee whose members were appointed by the Executive Board over Plaintiff's objection, whose report adopted the charging parties' hearsay account of management's reaction as "reliable," and whose recommended penalty the Executive Board adopted without independent review; and (g) the imposition of the penalty on September 1, 2026, before any appeal, notwithstanding counsel's sworn representation to this Court.

255. Plaintiff is informed and believes, and on that basis alleges, that in furtherance of the conspiracy NYCTA counsel Granata, Union counsel Kennedy, and O'Beirne communicated with one another concerning Plaintiff's case outside of Plaintiff's presence, that NYCTA management and the Union's leadership communicated concerning the desired outcome and its timing relative to the Union election, and that Chiarello and NYCTA management communicated in 2026 concerning the Union's response to

Plaintiff's bus-safety reporting. The content of those communications is peculiarly within Defendants' knowledge and will be established through discovery, including discovery directed to the non-party adjudicators.

256. The conspiracy resulted in the actual deprivation of Plaintiff's First Amendment right to speak as a citizen on matters of public concern without retaliation, and his Fourteenth Amendment rights to due process and equal protection, causing him the injuries alleged above.

257. Plaintiff does not seek damages from O'Beirne or from the Trial Committee members, and does not name them as defendants. He pleads their participation because the immunity of an adjudicator does not shield the private and public parties who conspired with him, and because their role is a necessary element of the conspiracy alleged.

**SIXTH CAUSE OF ACTION**

**Prior Restraint and Compelled Speech, 42 U.S.C. § 1983**

**(Against TWU Local 100 and John V. Chiarello)**

258. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

259. The July 31, 2025 Chiarello cease-and-desist directive, the August 14, 2025 follow-up letter, and the May 21, 2026 Chiarello written warning constitute an ongoing, written system of prior restraint imposed by a state actor (acting jointly with NYCTA) on Plaintiff's protected speech.

260. Chiarello's demand that Plaintiff submit "all communications related to the contract" to "the President's Office" for pre-publication vetting is a classic and categorically unconstitutional system of prior restraint.

261. Chiarello's insistence that Union officers speak only through the President's Office is not a neutral rule of institutional discipline, and it is not the position of the Union as a whole. Upon information and belief, Chiarello has used his office to support Governor Hochul, whose administration appoints and controls the leadership of the MTA and NYCTA, over the objections of members and contrary to the position of the International Union. The "Union position" to which Plaintiff is told he must conform is Chiarello's and his Executive Board's position, not the members' or the International's.

262. Chiarello's instruction that Plaintiff is "not an autonomous actor" and that members and the public "do not differentiate" between Plaintiff's personal speech and the Union's position is an unconstitutional effort to compel Plaintiff to either remain silent or to conform his speech to the Union's preferred message, in violation of the First Amendment's prohibition on compelled speech. The message to which Plaintiff is compelled to conform is Chiarello's and his Executive Board's preferred message, which the International Union itself does not endorse.

263. Plaintiff's May 17, 2026 video and the underlying interview with the candidate for statewide office is core political speech entitled to the highest level of First Amendment protection. The Defendants' threat of internal union discipline in retaliation for that speech violates clearly established law and is causing, and will continue to cause, irreparable harm to Plaintiff's rights, justifying both damages and prospective injunctive relief.

## SEVENTH CAUSE OF ACTION

### Labor Management Reporting and Disclosure Act, 29 U.S.C. §§ 411(a)(1), 411(a)(2), 411(a)(5), 412, and 529

### (Against TWU Local 100, John V. Chiarello, Donald Yates, Gary Rosario, Scott Steinberg, Daniel Ascona, Jesse Argueta, and Carlos Bernabel)

264. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

265. Section 101(a)(2) of the Labor Management Reporting and Disclosure Act ("LMRDA"), 29 U.S.C. § 411(a)(2), guarantees to every member of a labor organization the right to meet and assemble freely with other members, to express any views, arguments, or opinions, and to express their views at union meetings upon any business properly before the meeting.

266. Section 101(a)(1), 29 U.S.C. § 411(a)(1), guarantees every member equal rights to nominate candidates, to vote in elections, and to participate in the deliberations of the organization.

267. Section 101(a)(5), 29 U.S.C. § 411(a)(5), provides that no member may be fined, suspended, expelled, or otherwise disciplined except after written specific charges, a reasonable time to prepare a defense, and a full and fair hearing.

268. Section 609, 29 U.S.C. § 529, makes it unlawful for a labor organization, or any officer, agent, shop steward, or other representative of a labor organization, to fine, suspend, expel, or otherwise discipline any member for exercising any right to which he is entitled under the Act.

269. Section 102, 29 U.S.C. § 412, provides a private right of action for such relief, including injunctions, as may be appropriate.

270. At all times relevant to this Complaint, Plaintiff was a member in good standing of TWU Local 100, and TWU Local 100 was a labor organization within the meaning of the LMRDA. From in or about January 2025 through September 1, 2026, Plaintiff was also an elected officer of the Union.

271. Plaintiff engaged in protected free speech and association under the LMRDA by interviewing a candidate for statewide office in New York, by addressing unsafe conditions of MTA buses, by raising awareness of racial discrimination, by exposing crime, by drawing attention to other social issues such as lack of accommodation for pregnant transit workers, by exposing lewd acts on transit vehicles, by criticizing the Union's leadership and its handling of contract negotiations, by communicating with governmental bodies, by organizing and associating with members at a private social event, and by other conduct specifically alleged in this Complaint.

272. The speech expressed by Plaintiff concerned matters of vital interest to the Union membership and fell squarely within the statutory protections of 29 U.S.C. § 411(a)(2).

273. TWU Local 100, acting through its officers and agents, willfully interfered with, restrained, and coerced Plaintiff in the exercise of his protected rights by publicly threatening Plaintiff at the 2023 mass membership meeting, by assaulting Plaintiff and causing serious leg bone fractures, by Chiarello's July 31, 2025 cease-and-desist directive, by the August 14, 2025 follow-up letter from union legal counsel, by the September 23, 2025 letter to Prudential interfering with Progressive Action's interview, by Chiarello's May 21, 2026 letter

directing that Plaintiff's communications be vetted by the President's Office, and by initiating, prosecuting, and adjudicating the Argueta, Yates, and Bernabel charges.

274. On September 1, 2026, TWU Local 100 disciplined Plaintiff within the meaning of 29 U.S.C. § 529 by removing him from elected office and barring him from any elective or appointive position for three years. The Yates discipline was imposed for Plaintiff's April 1, 2026 public reporting on unsafe buses and his related public statements, which are protected by § 411(a)(2). The Bernabel discipline was imposed for Plaintiff's organization of and association with members at a private social event and his refusal to disclose the identities of those who attended and contributed, which are protected by § 411(a)(2), under a By-Law provision that by its terms does not reach such an event. Both sanctions were imposed as part of a purposeful and deliberate attempt to suppress dissent within the Union, to remove the leading dissident from office, and to keep him off the ballot in the next election, and not for any conduct that impaired Plaintiff's ability to perform the duties of his office.

275. The discipline also violated § 411(a)(5). Among other things: the Yates charging document was, upon information and belief, altered after execution to add an allegation concerning Plaintiff's criticism of NYCTA's President; the Argueta charging party attempted to substitute a "Modified" charge at trial; the Trial Committee was appointed over Plaintiff's objection, which the Executive Board, composed in part of the charging parties, overruled; the Trial Committee rested its Yates finding on hearsay that it declared "reliable"; the Executive Board that adopted the reports included, upon information and belief, the charging parties themselves; and the penalty was imposed before the appeal that the Constitution provides and that the Union's counsel had represented to this Court would

precede any penalty. The Executive Board votes that sent the charges to trial and that adopted the reports were, moreover, directed outcomes rather than deliberations: one member has told Plaintiff that he voted to bring the charges because he had no choice, and after the trials others said anonymously that they opposed the result. A disciplinary process whose voting members are told how to vote, at the charging stage and at the punishment stage, is not a "full and fair hearing" within the meaning of § 411(a)(5).

276. The discipline further violated § 411(a)(1) by depriving Plaintiff, and the members of the RTO Department who elected him, of equal rights to nominate, vote, and participate: the office was taken from the members' chosen representative and, under By-Laws Article IX(a), is to be filled by appointment of the Executive Board rather than by election, and the three-year bar removes Plaintiff from candidacy in the next general election.

277. Defendants Chiarello, Yates, Rosario, Steinberg, Ascona, Argueta, and Bernabel are "officers, agents, shop stewards, or other representatives" of TWU Local 100 within the meaning of 29 U.S.C. § 529, and each of them initiated, prosecuted, voted upon, or imposed the discipline alleged.

278. The adverse actions taken by TWU Local 100 against Plaintiff were directly motivated by, and in retaliation for, Plaintiff's exercise of his protected free speech and associational rights and were intended to silence Plaintiff and suppress political dissent within the Union.

279. Pursuant to Section 101(a)(4) of the LMRDA, 29 U.S.C. § 411(a)(4), Plaintiff is not required to exhaust internal union remedies. The Union has already imposed its penalty and has implemented it, so that no internal appeal can prevent the injury; the Union's officers have demonstrated hostility to Plaintiff such that a fair and impartial internal

hearing is improbable, as shown by the conduct of the trials themselves and by the tolerance of the assault upon him; the Union disregarded its own appellate process and its representation to this Court in imposing the penalty; the internal process cannot award the full relief Plaintiff seeks; and requiring exhaustion would delay judicial review past the appointment of Plaintiff's replacement and past the nomination period for the next election. In any event, the statute caps any required exhaustion at four months. . Article XXII, Section 1 of the TWU Constitution further preserves members' right to resort to the courts.

280. As a direct and proximate result of TWU Local 100's unlawful and retaliatory conduct, Plaintiff has suffered, and continues to suffer, severe economic harm, including the loss of the salary and benefits of his elected office, loss of union rights, emotional distress, damage to reputation, and a chilling effect on his ongoing exercise of protected speech.

281. The conduct of TWU Local 100 and its agents was malicious, deliberate, and performed with reckless indifference to Plaintiff's federally protected rights, thereby warranting an award of punitive damages against the individual Defendants.

282. Plaintiff is entitled under 29 U.S.C. § 412 to an order vacating the September 1, 2026 Yates and Bernabel decisions, restoring him to the office of Vice President of RTO with all attendant rights, privileges, salary, and benefits, enjoining enforcement of the three-year bar, enjoining enforcement of the May 21, 2026 directive, enjoining compelled disclosure of the identities of members and contributors associated with the April 24, 2026 event, and enjoining further discipline for protected speech and association, together with damages and reasonable attorneys' fees.

## EIGHTH CAUSE OF ACTION

**New York State Constitution, Free Speech and Equal Protection**

**(Article I, §§ 8, 9, 11 of the New York Constitution; against all Defendants)**

283. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

284. Article I, §§ 8, 9, and 11 of the New York Constitution provide broader protections than their federal counterparts.

285. The New York Constitution protects citizen speech, dissident union political activity, and public-interest journalism. Defendants' conduct violated each of these protections, giving rise to a state constitutional tort under Brown v. State, 89 N.Y.2d 172 (1996).

286. Plaintiff has no adequate alternative remedy against the NYCTA, an authority that under New York law is not amenable to an equivalent of Monell-style relief. Therefore, the state constitutional tort lies.

## NINTH CAUSE OF ACTION

**New York Civil Service Law § 75-b, Public-Employee Whistleblower Retaliation**

**(Against NYCTA, McPhee, Basile, and Does 1–10)**

287. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

288. At all relevant times Plaintiff was a "public employee" within the meaning of N.Y. Civil Service Law § 75-b(1)(a) by reason of his employment as a Conductor by NYCTA, a public-benefit corporation. NYCTA is a "public employer" within the meaning of § 75-b(1)(b).

289. New York Civil Service Law § 75-b(2)(a) prohibits a public employer from dismissing or taking any other disciplinary or adverse personnel action against a public employee regarding the employee's employment because the employee discloses to a governmental body information: (i) regarding a violation of a law, rule, or regulation that creates and presents a substantial and specific danger to the public health or safety; or (ii) which the employee reasonably believes to be true and reasonably believes constitutes an improper governmental action.

290. Plaintiff's public disclosures from 2015 through May 21, 2026, including (a) his April 1, 2026 video and subsequent reporting on unsafe MTA buses being placed into revenue service in dangerous condition; (b) his February 2022 reporting that unauthorized persons had been observed operating revenue equipment in an NYCT train yard; (c) his reporting on the alleged sexual assault of a female Cleaner on transit property; (d) his reporting on the lewd-act incident captured on revenue equipment; (e) his reporting on homeless persons sleeping and using illicit substances in employee locker rooms accessible to and used by the public; (f) his reporting on alleged nepotism, money-lending arrangements, and conflicts of interest involving Assistant Chief Officers of Transportation; and (g) his reporting on the racially disparate application of NYCTA discipline, each constituted a disclosure to a "governmental body" within the meaning of § 75-b(2)(a) (including the New York State Office of the Attorney General, the MTA Office of the Inspector General, the New York City Council, elected officials and candidates for elected office, and the public at large, all of which are statutorily encompassed by the broad definition of "governmental body" in § 75-b(1)(c)). Each disclosure concerned violations of law, rule,

or regulation creating substantial and specific dangers to public health and safety, and/or improper governmental action that Plaintiff reasonably believed in good faith to be true.

291. Before his public disclosures, Plaintiff made good faith efforts to bring the underlying concerns to the attention of NYCTA management and TWU Local 100 leadership through internal channels and was ignored, deflected, assaulted, or buried, satisfying the good faith internal disclosure prerequisite of Section 75-b(2)(b). To the extent the disclosed conditions presented an imminent and serious danger to public health or safety, including the bus safety hazards disclosed in April and May 2026, Plaintiff was statutorily excused from any further internal disclosure requirement.

292. NYCTA, through the McPhee–Basile–Henschke surveillance-and-target campaign, the so-called "Social Media Review Committee," the downplay and tolerance of workplace violence against Plaintiff, the stockpiling of SIR charges, the forced disciplinary proceedings during Plaintiff's active workers' compensation leave, the deliberately viewpoint-discriminatory August 19, 2024 termination, and its acquiescence in and joint orchestration of the continuing 2025–2026 retaliatory campaign with TWU Local 100, took "retaliatory personnel action" against Plaintiff within the meaning of Section 75-b(2)(a) because of those disclosures.

293. Pursuant to New York Civil Service Law § 75-b(3)(a), in any disciplinary arbitration proceeding pursuant to a collective-bargaining agreement, where an employee raises a whistleblower defense, the arbitrator is required to separately consider and determine the merits of that defense, and if the arbitrator determines that the dismissal or other disciplinary action is based solely on a violation of Section 75-b(2)(a), the arbitrator is

required to dismiss the disciplinary proceeding regardless of the employee's guilt or innocence. Matter of Kowaleski v. NYS Dept. of Corr. Servs., 16 N.Y.3d 85 (2010).

294. Arbitrator O'Beirne made no separate determination of Plaintiff's whistleblower defense in DAN 24-2303-0035, even though the defense was identified and the relevant facts were placed before him. The award is therefore void on its face under New York Civil Service Law § 75-b(3)(a) and Kowaleski.

295. Plaintiff is entitled, under Section 75-b(3)(c) and the remedial framework incorporated by reference to N.Y. Labor Law § 740(5), to reinstatement, back pay, lost benefits, the full compensation for lost wages and benefits, civil penalties, attorneys' fees and costs, and such other relief as the Court deems just. The retaliatory acts directed at Plaintiff occurred within two years of the filing of this Complaint and continue through May 21, 2026 such that the statute of limitations under Sections 75-b(4) and 740(4) is satisfied. To the extent any disclosure pre-dates that two-year window, the continuing violation doctrine extends the period through the most recent retaliatory act.

## TENTH CAUSE OF ACTION

**New York Labor Law § 740, Whistleblower Retaliation by Private Labor Organization**
**(Against TWU Local 100 and Chiarello)**

296. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

297. New York Labor Law § 740(2) prohibits an employer from taking retaliatory action against an employee because the employee discloses, threatens to disclose, provides information to, or testifies before a public body regarding an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation, or that the

employee reasonably believes poses a substantial and specific danger to the public health or safety.

298. TWU Local 100 is an "employer" within the meaning of New York Labor Law § 740(1)(b), as it employs Plaintiff as a union officer in good standing exercising rights and obligations attached to union membership, employs union officers, and exercises control over the terms and conditions of Plaintiff's union membership including its threat of internal discipline, suspension, and removal of rights.

299. To the extent the Union's status as a Section 740 "employer" is disputed, Plaintiff in the alternative invokes the "joint-employer" doctrine and the broad protective construction this Court is required to give to Section 740 as a remedial statute.

300. Plaintiff's April 1, 2026 bus safety video, his subsequent reporting on the same subject, his May 17, 2026 video and underlying interview with a candidate for statewide office, and the long-running body of his public-interest journalism alleged above each constituted protected disclosure or threatened disclosure of activities, policies, or practices that Plaintiff reasonably believed in good faith to violate law, rule, or regulation, and/or to present a substantial and specific danger to the public health or safety, within the meaning of Section 740(2)(a). Plaintiff's disclosures regarding unsafe buses being placed into revenue service on the public streets of New York City present the precise type of public-safety danger the statute was enacted to protect, because the danger extended to the riding public, pedestrians, and other users of the public roads, not merely to MTA employees.

301. TWU Local 100, acting through Defendants Chiarello took "retaliatory action" against Plaintiff within the meaning of Section 740(1)(e), including: (a) Davis's January 2023

public threat at the mass-membership meeting; (b) the tolerance and condoning of the workplace violence against Plaintiff; (c) the Union's deliberate bad-faith handling of the 2024 disciplinary arbitration; (d) Chiarello's July 31, 2025 cease-and-desist directive; (e) the August 14, 2025 follow-up letter; (f) TWU Local 100's September 23, 2025 letter to Prudential; (g) Chiarello's April 2026 threat to file internal union charges following Plaintiff's bus safety video; (h) Chiarello's May 21, 2026 written warning issued in retaliation for Plaintiff's ongoing public-safety and political disclosures; and (i) the ongoing threat of internal union discipline up to and including expulsion from membership and stripping of associated rights.

302. Plaintiff complied with the internal disclosure prerequisites of Section 740(3) in good faith to the extent applicable. Plaintiff raised his public-safety concerns through internal channels and gave the Union and NYCTA a reasonable opportunity to address them before going public. To the extent the safety conditions disclosed by Plaintiff presented imminent and serious danger to public health or safety, particularly the bus-safety hazards disclosed in April and May 2026, Plaintiff was statutorily excused from any further internal-disclosure requirement.

303. Plaintiff is entitled to all remedies available under § 740(5), including but not limited to: (a) an injunction restraining continued retaliation; (b) reinstatement to his union position with full back rights and remedies; (c) compensation for lost wages, benefits, and other remuneration; (d) front pay; (e) compensation for any special damages sustained as a result of the retaliatory action, including litigation costs; (f) civil penalties of not more than ten thousand dollars ($10,000); (g) punitive damages where the retaliation was willful, malicious, or wanton; and (h) reasonable attorneys' fees, court costs, and expert witness

fees. Plaintiff's claims are timely under § 740(4)(a) because the most recent retaliatory action occurred on May 21, 2026, well within the two-year limitations period.

## ELEVENTH CAUSE OF ACTION

### First Amendment Whistleblower Retaliation, 42 U.S.C. § 1983

### (Against All State-Actor Defendants)

304. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

305. Plaintiff's public safety disclosures constitute speech as a private citizen on matters of public concern entitled to the highest level of First Amendment protection. First Amendment protection applies most prominently to his April 1, 2026 video on unsafe MTA buses and his entire decade of public reporting on conditions threatening the public, pedestrians, and other road users.

306. Whistleblowing about substantial and specific dangers to public health and safety lies at the heart of what the First Amendment protects because such speech serves the core constitutional function of informing the public about the conduct of government.

307. The Pickering balance weighs decisively in Plaintiff's favor. The public interest in being informed about unsafe MTA buses on the public streets, mismanagement of a public-benefit corporation that carries millions of New Yorkers each day, corruption and nepotism among NYCTA officers, and the conduct of the largest public transit system in North America is extraordinarily high. Conversely, Defendants cannot identify any actual operational disruption caused by Plaintiff's whistleblowing speech sufficient to outweigh that public interest. The "disruption" Defendants invoke is subjective managerial offense

at being publicly criticized, which does not support the governmental interest required to defeat protected status.

308. Defendants' retaliation against Plaintiff's whistleblowing through surveillance, tolerance of workplace violence against him, manufactured discipline, the August 19, 2024 termination, the July 31, 2025 and August 14, 2025 cease-and-desist letters, the April 2026 internal-charge threats, and the May 21, 2026 prior-restraint warning, was a substantial and motivating factor for those adverse actions and would chill a person of ordinary firmness from continuing to engage in public-safety whistleblowing. Defendants' conduct violates clearly established law and is not protected by qualified immunity.

309. This First Amendment whistleblower claim is pleaded in addition to, and not in lieu of, Plaintiff's general First Amendment retaliation claim, because the public-safety nature of Plaintiff's whistleblowing speech strengthens the Pickering balance, expands the universe of cognizable adverse actions, and entitles Plaintiff to the heightened protective treatment that First Amendment doctrine and federal policy uniformly accord to public-safety whistleblowers.

## TWELFTH CAUSE OF ACTION

## New York Labor Law § 201-d, Retaliation for Lawful Off-Duty Recreational/Political Activity

## (Against NYCTA and TWU Local 100)

310. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

311. New York Labor Law § 201-d(2) prohibits an employer from discriminating against an employee "because of … an individual's political activities outside of working hours, off

of the employer's premises and without use of the employer's equipment" or "the individual's legal recreational activities outside work hours, off of the employer's premises and without use of the employer's equipment."

312. Plaintiff's Progressive Action speech, his candidacy and campaigning for TWU Local 100 office, and his interview with a candidate for statewide New York office all squarely qualify as protected "political activities" under Section 201-d(1)(a). To the extent his off-duty public-interest media work is alternatively analyzed as a "recreational activity," such political discussion is also protected by statute.

313. NYCTA terminated Plaintiff because of those activities. TWU Local 100, through Chiarello, has continued to threaten Plaintiff with internal union discipline because of those activities, most recently in the May 21, 2026 written warning targeting his interview with a candidate for statewide office. The exceptions in § 201-d(3)(a) and (4) do not apply, as no "material conflict of interest related to trade secrets, proprietary information or other proprietary or business interest" existed, and the "misconduct" safe-harbor was not invoked in good faith but rather pretextually.

314. Plaintiff is entitled to equitable and legal relief including reinstatement, back pay, injunctive relief against the continuing prior restraint, and damages under Section 201-d(3)–(5).

## THIRTEENTH CAUSE OF ACTION

**Declaratory and Injunctive Relief**

**(Against All Defendants under 28 U.S.C. §§ 2201–2202)**

315. Plaintiff repeats and realleges each and every allegation set forth above as if fully set forth herein.

316. An actual case and controversy exists. Plaintiff seeks declarations that (i) NYCTA's social-media and "Respectful Workplace" directives as applied to him were unconstitutional and constituted retaliatory action under New York Civil Service Law § 75-b; (ii) his August 19, 2024 termination violated the First and Fourteenth Amendments, New York Civil Service Law § 75-b, and New York Labor Law § 201-d; (iii) the July 31, 2025, August 14, 2025, and May 21, 2026 letters issued by Chiarello constitute an unconstitutional prior restraint on protected speech and an unlawful retaliatory action against Plaintiff's public safety whistleblowing under New York Civil Service Law § 75-b and New York Labor Law § 740; (iv) the August 19, 2024 arbitration award is void under New York Civil Service Law § 75-b(3)(a), Matter of Kowaleski v. NYS Dept. of Corr. Servs., 16 N.Y.3d 85 (2010), and the Due Process Clause; (v) the September 1, 2026 Yates and Bernabel decisions were imposed in violation of 29 U.S.C. §§ 411(a)(1), (a)(2), (a)(5), and 529 and are void; and (vi) the conduct of TWU Local 100 alleged herein violated Plaintiff's statutory and constitutional rights.

317. Plaintiff seeks injunctive relief requiring (i) his reinstatement to his position as a Conductor with full seniority, benefits, and back pay; (ii) expungement of the August 19, 2024 termination award and related disciplinary record; (iii) cessation of NYCTA's surveillance of his protected speech; (iv) withdrawal of the July 31, 2025, August 14, 2025, and May

21, 2026 cease-and-desist and prior-restraint letters; (v) vacatur of the September 1, 2026 Yates and Bernabel decisions and restoration of Plaintiff to the office of Vice President of RTO with all attendant rights, privileges, salary, and benefits; (vi) an injunction against enforcement of the three-year bar on elective or appointive office and against any appointment to fill the office; (vii) an injunction against compelled disclosure of the identities of members and contributors associated with the April 24, 2026 event; and (viii) a prohibition on any further internal union charges or threats issued in retaliation for his protected activity.

## JURY DEMAND

318. Plaintiff demands a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Tramell Thompson respectfully requests that this Court enter judgment in his favor and against Defendants, jointly and severally where appropriate, and grant the following relief:

(a) A declaration that Defendants' conduct violated the First and Fourteenth Amendments to the United States Constitution, Sections 101(a)(1), (a)(2), (a)(5), and 609 of the LMRDA, Article I §§ 8, 9, and 11 of the New York State Constitution, New York Civil Service Law § 75-b, New York Labor Law § 740, and New York Labor Law § 201-d;

(b) A declaration that the July 31, 2025, August 14, 2025, September 23, 2025, and May 21, 2026 letters constitute an unconstitutional prior restraint on Plaintiff's protected speech and political activity and an unlawful retaliatory action against Plaintiff's protected whistleblowing under New York Civil Service Law § 75-b and New York Labor Law §

740, and that the September 1, 2026 Yates and Bernabel decisions violate 29 U.S.C. §§ 411 and 529, and an order directing the withdrawal of those letters and the vacatur of those decisions;

(c) A declaration that the August 19, 2024 arbitration award (DAN 24-2303-0035) is void under New York Civil Service Law § 75-b(3)(a), Matter of Kowaleski v. NYS Dept. of Corr. Servs., 16 N.Y.3d 85 (2010), and the Due Process Clause of the Fourteenth Amendment, for failure to separately consider and determine Plaintiff's whistleblower defense;

(d) Equitable reinstatement of Plaintiff to his position as a Conductor at NYCTA with full seniority, benefits, and restoration of all rights as if termination had never occurred;

(e) Back pay, front pay, lost benefits, the lost salary and benefits of Plaintiff's elected union office, lost union membership rights and privileges, and prejudgment and post-judgment interest;

(f) Vacatur of the September 1, 2026 Executive Board decisions in *Yates, et al. v. Thompson* and *Bernabel v. Thompson*, restoration of Plaintiff to the office of Vice President of RTO of TWU Local 100 with all attendant rights, privileges, salary, and benefits retroactive to September 1, 2026, and a permanent injunction against enforcement of the three-year bar on elective or appointive office and against any appointment to fill that office;

(g) A permanent injunction against enforcement of the May 21, 2026 directive requiring that Plaintiff's communications be vetted by the President's Office, and against compelled disclosure of the identities of members and contributors associated with the April 24, 2026 event;

(h) Compensatory damages in an amount to be determined at trial, but not less than $5,000,000.00, for physical injury, pain and suffering, emotional distress, reputational injury, and loss of First Amendment freedoms;

(i) Punitive damages against the individual Defendants in an amount sufficient to punish and deter, but not less than $2,000,000.00 per individual Defendant;

(j) Civil penalties under New York Labor Law § 740(5)(g) in the amount of $10,000 per violation;

(k) A permanent injunction enjoining Defendants from further surveillance, retaliation, prior restraint, compelled speech, interference with Plaintiff's protected speech and union political activity, or further retaliatory action under New York Civil Service Law § 75-b and New York Labor Law § 740, including, but not limited to, an injunction prohibiting Defendants from filing internal union charges against Plaintiff based on his protected whistleblowing or his interview with the candidate for statewide office;

(l) Expungement of the August 19, 2024 arbitration award and related disciplinary record;

(m) Attorneys' fees, court costs, expert-witness fees, and litigation expenses pursuant to 42 U.S.C. § 1988, 29 U.S.C. § 412, New York Civil Service Law § 75-b, New York Labor Law § 740(5)(h), and any other applicable authority; and

(n) Economic damages, including lost wages, salary, employment benefits, the compensation and benefits of Plaintiff's elected office, legal fees incurred in defending the internal charges, and diminished earning capacity, in an amount to be determined at trial;

(o) For declaratory relief declaring Defendants' conduct unlawful;

(p) For preliminary and permanent injunctive relief to prevent and restrain Defendants from continuing their unlawful retaliatory conduct;

(q) For such other and further legal and equitable relief as the Court deems just and proper.

Dated: Brooklyn, New York
October 2, 2026

Respectfully,

__________________________

Jimmy Wagner, Esq.
THE WAGNER FIRM
*Attorney for Plaintiff Tramell Thompson*
2055 Flatbush Avenue
Brooklyn, New York 11234
Tel.: (929) 477-8889
Email: jimmy013@gmail.com

## VERIFICATION

STATE OF NEW YORK )
) ss.:
COUNTY OF KINGS )

TRAMELL THOMPSON, being duly sworn, deposes and says:

I am the Plaintiff in the above-entitled action. I have read the foregoing Second Amended Verified Complaint and know the contents thereof. The same is true to my own knowledge, except as to those matters therein stated to be alleged upon information and belief, and as to those matters I believe them to be true.

TRAMELL THOMPSON

Sworn to before me this

2 day of October, 2026.

NOTARY PUBLIC

DORLA ANGLIN
Notary Public, State of New York
No. 01AN4960563
Qualified in Nassau County
Cert. Filed in Kings County
Commission Expires 12/26/2029